CONSERVANCY HOLDINGS, LTD., Appellant, v PERMA-TREAT CORPORATION, Respondent. (Action No. 1.)

PERMA-TREAT CORPORATION, Respondent, v CONSERVANCY HOLDINGS, LTD., Appellant. (Action No. 2.)

Third Department, March 12, 1987

## APPEARANCES OF COUNSEL

*Eleazar Lipsky* for appellant.

*McCabe & Mack (David L. Posner* of counsel), for respondent.

## OPINION OF THE COURT

WEISS, J.

On April 10, 1979, the parties entered into an agreement denominated a "bill of sale of forest products" pursuant to which Conservancy Holdings, Ltd. (Conservancy) agreed to sell two million board feet, more or less, of northern hardwood timber standing on its lands in the Town of Gardiner, Ulster County. Perma-Treat Corporation (Perma-Treat) agreed to purchase the timber for the total sum of $140,000 payable in four equal installments and to cut and remove the trees under the supervision of Conservancy's timber agent. The agreement further provided that Conservancy's consulting forester, Kenneth L. Williams, would mark the trees to be cut and provide a tally of all marked lumber available for Perma-Treat's use. A monetary penalty was imposed for the cutting of any unmarked trees. All logging operations were required to comply with the relevant guidelines issued by the Department of Environmental Conservation, and Perma-Treat assumed responsibility for damages to the land exceeding normal wear and tear. The parties agreed on a procedure to mark off four areas for harvesting, denominated Phases I through IV, each containing about 500,000 board feet of timber, which were to be harvested in sequence and be completed by April 10, 1981. In March 1979, Williams submitted a tally sheet for Phase I, confirming over 500,000 feet of board timber. Harvesting on Phase I commenced in April 1979 and, after suspension due to weather conditions, was resumed in May 1980. Phase II was then commenced without a timely written tally of marked trees. At this point, the first two installment payments had been paid without incident.

The instant controversy centers around the payment of the third installment, due July 10, 1980. On that date, Conservancy's principal officer, John A. Bradley, telephoned Perma-Treat's president, David A. Fink, inquiring as to the $35,000 payment that was at that point overdue. That same day, Perma-Treat's forester, Thomas E. Worthley, completed a survey of the projected Phase III area, which showed that the required 500,000 board feet had not been marked and the remainder of Conservancy's property did not contain sufficient trees to satisfy the Phase IV requirements. When Fink indi-

cated that payment was withheld due to the shortage of timber, Bradley declared Perma-Treat in default and further accused Perma-Treat of numerous environmental violations. A follow-up mailgram to that effect was sent the same evening, directing Perma-Treat to immediately cease all operations. At some point on July 10, 1980, it appears Fink drafted a letter to Conservancy stating that the latter was in breach for failing to provide written tallies for Phases II and III and because of the shortage of timber in Phase III. While a dispute exists as to whether this letter was mailed on July 10, 1980 or the next day, the letter was not received by Conservancy until the first week of August 1980.

On July 15, 1980, the parties' foresters, Williams and Worthley, met to view the Phase III area. At this time, Williams provided a written second and third tally, which showed an excess of 500,000 feet of timber marked in Phase III. When Worthley opined that less than 300,000 feet of timber was available in Phase III, and that Conservancy lacked the capacity to provide a fourth 500,000 feet of timber, Williams ostensibly indicated that Conservancy could get the remaining timber from other property it owned. After negotiations collapsed, Conservancy commenced action No. 1 to recover the $70,000 balance of the purchase price plus damages to its land. In its answer, Perma-Treat asserted it was justified in canceling the agreement because of Conservancy's alleged breach. Perma-Treat then commenced action No. 2 seeking a refund for the timber actually paid for in Phase II but not removed and damages for breach of contract, due to Conservancy's failure to properly mark and tally trees to be cut and wrongful termination of the logging operation. A trial jury found in favor of Perma-Treat, awarding damages of $40,250. The trial court denied Conservancy's posttrial motion to set the verdict aside. This appeal by Conservancy ensued.

■ Conservancy maintains that its postverdict motion should have been granted because, *inter alia,* the jury's determination that Perma-Treat was justified in withholding the payment due July 10, 1980 was against the weight of the evidence. We disagree. A verdict will be set aside on this basis only if the jury determination could not have been reached on any fair interpretation of the evidence *(Schnarch v Owen,* 124 AD2d 372; *Nicastro v Park,* 113 AD2d 129, 132-134). Here, the parties presented divergent explanations for the cancellation of the contract. Perma-Treat justified its refusal to pay on the asserted shortage of timber in the Phase III area, as measured

by its forester, Worthley, and confirmed by another expert. Additionally, Perma-Treat emphasized Conservancy's failure to provide a written tally for Phase III as required by the agreement. While the written tally provided by Conservancy's forester, Williams, showed that over 500,000 feet of timber had been marked in Phase III, there was no compelling reason for the jury to accredit his tally over that of Worthley. Moreover, whether Perma-Treat waived its right to the third tally by failing to insist on a written tally for Phase II also presented a factual question for the jury (see, 22 NY Jur 2d, Contracts, § 330, at 212). Under general contract law, a party may repudiate a contract for substantial nonperformance where the breach speaks to the very essence of the agreement (see, 22 NY Jur 2d, Contracts, §§ 327, 437, at 207, 360). A buyer of goods is similarly permitted to cancel a contract for breach by the seller and, in so doing, retains all remedies for the breach (see, UCC 2-106 [4]; 2-711 [1]; 51 NY Jur, Sales, §§ 185, 240, at 223, 302 [1966]). Applying these principles, we find the jury could fairly determine that Perma-Treat was justified in withholding payment since a substantial shortage of marked trees had been discovered by its forester. This holds true regardless of whether Fink's termination letter of July 10, 1980 was mailed in advance of Bradley's oral and written declaration of default that same day. Conservancy's further contention that the Fink letter was sent in bad faith is clearly unfounded.

■ Conservancy also maintains that it became entitled to judgment as a matter of law by placing the bill of sale in evidence and showing full performance until Perma-Treat canceled the agreement by its letter of July 10, 1980. The crux of this argument is that the April 10, 1979 agreement constituted an instant sale of timber entitling Conservancy to the full purchase price. Again, we disagree. While a contract for timber to be cut constitutes a contract for the sale of goods (see, UCC 2-107 [2]), the goods must be existing and identified before any interest can pass (see, UCC 2-105 [2]; 2-401 [1]; 50 NY Jur, Sales, § 45, at 587 [1966]). Unless these two criteria are satisfied, the contract operates as a contract to sell "future" goods (ibid.). Here, the contract was for the sale of timber to be marked by Conservancy's forester or timber agent. The goods were not "identified" until Conservancy's forester marked them with "a blue paint strip diagonally 4.5' above ground". Thus, the jury could rationally conclude that

the April 10, 1979 agreement operated as a contract to sell future goods pursuant to which Conservancy was under a continuing obligation to timely mark the timber *(see, Kozlowski v City of Amsterdam,* 111 AD2d 476, 477).

■ As to Conservancy's claim for damages to its property occasioned by Perma-Treat's alleged failure to exercise good logging practices, there was ample basis in the record for the jury to conclude that Perma-Treat exercised a professional operation without occasioning any damages beyond normal wear and tear. Significantly, no claim was made that Perma-Treat refused any instructions to make repairs as set forth in the contract.

■ Our review of the record further shows that Conservancy failed to except to the trial court's jury charge and thus the claimed errors were not preserved for review *(see,* CPLR 4110-b; *Chiesi v Lumbermens Mut. Cas. Co.,* 97 AD2d 884, 885; *Tompkins v R. B. D. Land Exch.,* 89 AD2d 698, 699). Nor do we discern any error or impropriety so fundamental as to warrant consideration of the issues raised in the interest of justice *(supra).* Even assuming Conservancy properly objected to the special verdict sheet, we cannot agree that this document was confusing or produced an inconsistent result from the jury. The paramount issue in this case, whether Perma-Treat was justified in canceling the agreement, was properly framed. While the jury listed the verdict amount in two separate spaces on this sheet, leading the court to initially inquire whether the verdict was a "wash", the jury foreman explained that an inadvertent error had been made and that it was the intention of the jury to find for Perma-Treat only, in the amount of $40,250. The jury was polled and agreed. This simple mistake did not render the verdict invalid *(see, e.g., Schnarch v Owen,* 124 AD2d 372, *supra).*

Finally, the damage award to Perma-Treat finds ample basis in this record. The parties' contract provided for a refund for trees not cut but paid for upon termination by Conservancy. In addition, Perma-Treat was entitled to recover both incidental and consequential damages *(see,* UCC 2-715 [1], [2]), including lost profits *(see,* UCC 2-715 [2] [a]).

CASEY, J. P., MIKOLL, YESAWICH, JR., and HARVEY, JJ., concur.

Judgment affirmed, with costs.