[645 NYS2d 779]

In the Matter of the Liquidation of the NEW YORK AGENCY AND OTHER ASSETS OF BANK OF CREDIT AND COMMERCE INTERNATIONAL, S. A. SUPERINTENDENT OF BANKS OF THE STATE OF NEW YORK, Appellant; CITIC INDUSTRIAL BANK, Respondent.

In the Matter of the Liquidation of the NEW YORK AGENCY AND OTHER ASSETS OF BANK OF CREDIT AND COMMERCE INTERNATIONAL, S. A. INDUSTRIAL BANK OF JAPAN, LIMITED, Appellant; NEIL D. LEVIN, Respondent.

First Department, July 18, 1996

### APPEARANCES OF COUNSEL

*Howard S. Zelbo* of counsel *(Thomas J. Moloney, Barry D. Ford* and *J. Michal Roebuck* on the brief; *Cleary, Gottlieb, Steen & Hamilton,* attorneys), for Superintendent of Banks, appellant.

*John S. Kiernan* of counsel *(John H. Hall, Barton Legum* and *Jeremy Feigelson* on the brief; *Debevoise & Plimpton,* attorneys), for CITIC Industrial Bank, respondent.

*Wayne Charles Matus* of counsel *(A. John P. Mancini* and *Mark A. Strauss* on the brief; *Christy & Viener,* attorneys), for Industrial Bank of Japan, appellant.

*Eric L. Lewis* and *A. Katherine Toomey* of counsel *(Nussbaum & Wald,* attorneys), for court-appointed fiduciaries of the principal BCCI Corporations, *amicus curiae.*

### OPINION OF THE COURT

MILONAS, J. P.

On July 5, 1991, the Superintendent of Banks of the State of New York seized the New York Agency of the Bank of Credit and Commerce International, S. A. (BCCI), a worldwide venture incorporated in Luxembourg, whose financial stability had been the subject of international headlines during the early part of that year. This action was taken in coordination with liquidators elsewhere around the world with respect to BCCI's operations. It is undisputed for purposes of this appeal that the Superintendent was justified in taking this action on the grounds that, pursuant to Banking Law § 606 (4), BCCI was in an "unsound or unsafe condition to transact its business." (Banking Law § 606 [1] [c].)

At issue before us are two separate matters consolidated by the IAS Court solely for purposes of deciding each claimant's motion for the return of a portion of the funds that were on hand in a BCCI account at Bank America International (BAI) on July 5th in the name of BCCI's Tokyo branch (among other BCCI accounts at BAI), and the Superintendent's application to retain such funds for use in the New York liquidation proceeding. All the funds in that account that day are now being held in a segregated account pending resolution of this matter. In the proceedings before the IAS Court, the claim-

ants, CITIC Industrial Bank (CITIC) and Industrial Bank of Japan (IBJ), contended that, unlike those creditors who must await the liquidation process, they were entitled to certain funds out of the seized assets immediately because the funds they claim should not have been among the assets seized. Claimants did not and do not seek to get at the head of the line of BCCI's many creditors here, as the Superintendent characterizes these actions; their contention is that they do not belong in the line at all.

Specifically, CITIC sought the return of $31,000,000, which it claims was improperly accepted as a deposit (by means of electronic transfer) into BAI's account hours after the early morning shutdown of BCCI operations on July 5, 1991. IBJ sought the turnover of $32,000,000, title to which, according to IBJ, had already vested in IBJ at the time of the seizure although no physical transfer had occurred.

 The IAS Court, in a single written opinion, concluded that the acceptance of CITIC's deposit following the shutdown of operations constituted an ultra vires act by the Superintendent, and directed the return of those funds to CITIC. IBJ, however, which was awaiting the transfer of funds from BCCI's Tokyo branch (BCCI Tokyo) on July 5, 1991, as the final step in a "swap" of foreign currencies—an exchange that began on July 3, 1991—was not entitled to those funds, notwithstanding the fact that the second part of the transaction was all but complete at the time of the shutdown. For the reasons set forth below, we find that the Superintendent is entitled to all of the disputed funds at BAI in the BCCI Tokyo account on July 5, 1991, for the New York liquidation, and therefore affirm the denial of the turnover of funds to IBJ and reverse that part of the order granting the turnover of funds to CITIC.

### The IBJ Transaction

The transaction in question was a trade in national currencies on the foreign exchange (a "forex" swap), the kind of transaction that IBJ and BCCI had executed on many prior occasions. This particular swap was negotiated on July 2, 1991, when the parties agreed to an exchange of dollars and yen in a two-part transaction: the first was to consist of IBJ's sale of $32,000,000 to BCCI Tokyo in exchange for Japanese yen (a "dollars for yen exchange"). This part of the swap, referred to as a "spot" foreign exchange agreement, was to be completed on July 3, 1991. The second part was to consist of IBJ's purchase of $32,000,000 from BCCI Tokyo for Japanese yen (a

"yen for dollars exchange"). Referred to as a "forward" foreign exchange agreement, this part of the swap was to be completed on July 5, 1991. While the dollar amount remained constant, the amount of yen in the "forward" exchange was slightly higher than in the "spot" exchange.

Because of the time difference between Tokyo and New York, the second stage transaction would not be strictly simultaneous, as is often the case in a forex swap. In fact, due to the gap between settlements, this type of swap is called a "tomorrow next swap transaction." As a general matter, however, because these transactions, whether simultaneous or not, are a swap rather than a loan or extension of credit, they are considered virtually "risk-free."

The first stage of the swap was accomplished on July 3, 1991: BCCI delivered the yen to IBJ, and IBJ transferred the dollars from its account at Morgan Guarantee Trust in New York to BCCI Tokyo's account at BAI. As noted, the second stage was to be completed by the end of the business day Tokyo time on July 5th, with the exception of the transfer of dollars from BAI to IBJ's Morgan Guarantee account, which would take place on July 5th New York time (due to the 13-hour time difference, the business day in Tokyo ends before the business day in New York begins). As contemplated, the yen were deposited in a BCCI Tokyo bank account in Japan by the end of the business day, Tokyo time, on July 5th. All that was left to complete the "yen for dollars exchange" part of the swap was the transfer of dollars in New York from BCCI Tokyo's account at BAI to IBJ's account at Morgan Guarantee. This transfer never occurred.

What transpired instead, before business ever opened that day, was the seizure and shutdown of BCCI's New York operations, set in motion, as it relates to these claimants, when the president of BAI was instructed by a Federal Reserve Board examiner at approximately 8:15 A.M. that no monies were to be transferred out of any BCCI account. Notice of the seizure was duly posted on the New York Agency's door at approximately 9:00 A.M. that morning, and BAI received formal notification to this effect shortly thereafter. By this turn of events, the performance of the last act of the swap was abruptly halted, and a supposedly risk-free venture became a total loss.

In claiming that it stands in a different and better position than BCCI's other creditors, and is entitled to the dollars contracted and, indeed, paid for, IBJ argues that the Superintendent never had title to the disputed funds because he never

took possession of them; that, in any event, title had vested in IBJ before 9:00 A.M. on July 5th, prior to the shutdown; that IBJ has a right to recover the funds under the UCC because the dollars were identifiable goods; that BAI was merely a bailee for IBJ's benefit; that court interference with a payment order to an intermediary bank is prohibited by the UCC; and that IBJ is entitled to a constructive trust of the disputed funds.

██ Under Banking Law § 606 (4) (a), by virtue of the seizure of BCCI's New York Agency, title to all of its "business and property in this state" vests "forthwith" in the Superintendent "by operation of law." Pursuant to the statute, actual possession of the disputed funds or property is unnecessary; immediate passage of title by operation of law prevents the possibility of disposition or dissipation of assets while the Superintendent attempts to locate them. Thus, title to the funds in the BAI account, which constituted part of BCCI's property in this State, vested immediately in the Superintendent regardless of what time BAI received formal notice of the seizure, and IBJ has no recognizable claim to the disputed funds. Moreover, there is no support for IBJ's contention that the transfer was to have been made as soon as the bank opened that morning, and therefore would have been made prior to BAI's formal notice of the seizure but for the intervention of the Federal Reserve examiner.

Contrary to its arguments, and fatal to its claim, IBJ never had title to any dollars prior to the seizure. While dollars may be considered "goods" for UCC purposes when traded as a commodity (*see, Compania Sud-Americana de Vapores v IBJ Schroder Bank & Trust Co.*, 785 F Supp 411, 431 [SD NY]; *Intershoe, Inc. v Bankers Trust Co.*, 77 NY2d 517, 521), no dollars in the BAI account on the morning of July 5th were specifically designated or otherwise earmarked for the express purpose of completing the sale to IBJ. The absence of "identifiable" goods defeats IBJ's claim that title had somehow passed (*see, e.g., Conservancy Holdings v Perma-Treat Corp.*, 126 AD2d 114, 118).

Even if there were enough money in the BAI account on the morning of July 5th to complete the transaction, that alone would not bridge the gap between the existence of such funds and the conclusion that it was those very dollars that were to be used to satisfy this contract. Lest it appear that the dollars IBJ transferred into BAI on July 3rd as part of the "spot" exchange were sitting in the account waiting, in effect, to be "returned" to IBJ on July 5th as part of the "forward"

exchange, it should be noted that at the close of every business day, the balance in that account exceeding $400,000 was used for overnight deposits elsewhere.

IBJ contends that other dollars had been transferred into the BAI account for the express purpose of "settling" the IBJ swap, but this is not borne out by the record. That some deposits were made (from various sources) that happen to exceed the total amount due IBJ is not the same as dollars identifiable to the contract.

Nor can IBJ claim title merely because BCCI Tokyo had relayed the requisite instructions to BAI to transfer $32,000,000 on July 5th. According to IBJ, BCCI Tokyo completed its performance as seller with this instruction to BAI, and, with no further action required of the seller, title then passed to IBJ as buyer. IBJ relies on the Second Circuit's decision in *In re Koreag, Controle et Revision* (961 F2d 341, *cert denied* 506 US 865) to demonstrate such transfer of title, but *Koreag* actually mandates the opposite result. Indeed, as IBJ itself points out, the facts in *Koreag* are strikingly similar to those presented here: in both cases, the parties engaged in a two-part swap, in which each party was both buyer and seller. *Koreag* makes clear that the buyer of dollars—the position in which IBJ stands in this part of the swap—has no remedy of recovery under the UCC in the event of the seller's insolvency where the currency is not identifiable. IBJ seeks to distinguish *Koreag* in the single respect which would inure to its benefit, claiming that the goods were in fact identifiable, but, as discussed above, this was not the case. The fact that the funds were to be transferred out of a particular account—the BCCI Tokyo account at BAI—does not sufficiently identify particular funds for this purpose.

■ Before turning to CITIC's claim, we address one final argument advanced by IBJ, concerning the imposition of a constructive trust. IBJ maintains that the IAS Court's refusal to impose such a trust was based on a misapprehension of the applicable law. While IBJ correctly asserts that no particular conditions must be met in order to impose a constructive trust (*compare, Palazzo v Palazzo*, 121 AD2d 261, 264, *with Sharp v Kosmalski*, 40 NY2d 119, 121), the fundamental basis for such a trust is lacking here: IBJ cannot demonstrate that some act of egregious unfairness placed the disputed funds in the Superintendent's hands (*see, Simonds v Simonds*, 45 NY2d 233, 241-242). From IBJ's viewpoint, the seizure may have been an act of acute misfortune, but, in effecting the seizure, the Super-

intendent acted only pursuant to and in accord with the express provisions of the Banking Law. Because title was transferred in keeping with the statutory scheme of Banking Law § 606, the Superintendent cannot be said to have taken title in an unfair or inequitable manner, and thus a constructive trust is not warranted. Unlike *Koreag*, where the Second Circuit determined that the particular circumstances, including currency exchanges between the parties *after* the liquidation began (961 F2d, *supra*, at 355), justified allowing them to develop their respective positions concerning a constructive trust before a finder of fact, no such circumstances are present here.

## CITIC's Transaction

In contrast to IBJ, which was awaiting the transfer of dollars, CITIC was in the position of a depositor. CITIC had agreed to make a deposit of $31,000,000 with BCCI Tokyo on July 5th (a Friday); this deposit was to be held until July 8th (a Monday) and earn a high rate of interest. CITIC, based in China, previously had made many such "overnight" deposits with BCCI Tokyo. Although the deposit was made with BCCI Tokyo in Tokyo on July 5th Tokyo time, the funds wound up in the BAI account in New York in the following manner: because the deposit was denominated in dollars, BCCI Tokyo requested CITIC to transfer the amount in question into the BAI account. CITIC complied by authorizing its correspondent New York bank, Citibank, to effect the transfer of $31,000,000 to BAI. Once such transfers are ordered and approved, the Citibank computer system (with which CITIC had direct access through its Beijing offices) enables the transfers to be processed automatically without further direction.

It appears that the source of dollars to be used by Citibank for the transfer was a CITIC account with the Shenzen, China, branch of BCCI Overseas, a BCCI subsidiary with whom CITIC also regularly made overnight deposits such as this. Of $41,000,000 from the Shenzen account due to come into the Citibank account on July 5th, the sum of $31,000,000 was to be transferred to BAI. However, the worldwide seizure of BCCI on July 5th prevented funds from being moved out of the Shenzen account to Citibank. When a Citibank employee became aware that CITIC's Citibank account showed insufficient funds to cover the transfer to BAI as ordered (although unaware of the reason for the insufficiency), an override was issued that permitted the transfer to go through, using overdraft and extended-credit funds.

The ill-fated transfer order was actually entered at 1:53 A.M. New York time on July 5th and approved for release two hours later, well before the seizure in New York. While it is debatable whether a stop order could be executed in this system, given the volume of transactions in the course of an ordinary day, no such order was in fact given, and the transfer, along with thousands of others, went through; according to BAI's records, it was received at 5:27 P.M. and credited at 6:26 P.M. Because of the worldwide seizure, the deposit was not returned on July 8th, despite the demand made by CITIC on BCCI Tokyo.

The IAS Court accepted CITIC's allegation that the Superintendent had specifically directed the acceptance of this deposit, and concluded that this constituted an ultra vires act on his part. Accordingly, the court determined that the amount of the deposit, plus interest, should be returned. Subsequently, in denying the Superintendent's motion for reargument, the court acknowledged that while the Superintendent may not have specifically directed the acceptance of this particular deposit, nevertheless he had exceeded his authority by permitting the acceptance of deposits after the seizure was effected.

The premise of CITIC's claim for the return of its funds is that once the BAI account was seized early on the morning of July 5th, no business whatsoever should have been conducted: if no money was to be paid out, then no money should have been accepted into the account. While at first blush there is some appeal to this argument—on the theory that once business shuts down, it should cease for all purposes, not selective purposes—upon closer examination it should be rejected.

Banking Law § 606 (4) (a) gives the Superintendent broad discretion to take possession of a troubled bank's property and "liquidate or otherwise deal with such business and property." The latter includes all property "(1) wherever situated, constituting part of the business of the New York agency or branch and appearing on its books as such, and (2) situated within this state whether or not constituting part of the business of the New York agency or branch or so appearing on its books" (Banking Law § 606 [4] [c]). Banking Law § 618 (1) further provides that he is authorized, "upon taking possession of any banking organization, to liquidate the affairs thereof and to do all acts and to make such expenditures as in his judgment are necessary to conserve its assets and business." That the Superintendent has substantial discretion, rather than the limited powers ascribed to him by the claimant here, is sup-

ported by the statutory language itself, which confers authority "to do all acts" and to "liquidate or otherwise deal with" the seized business and property (*see, Peterson v State of New York*, 67 AD2d 1054, *lv denied* 47 NY2d 707; *but see, Federation Bank & Trust Co. v Hammons*, 176 Misc 447).

The statutory scheme for liquidation does not provide an exhaustive list of the Superintendent's powers, nor does it proscribe a particular activity. Indeed, common sense dictates that in the process of a liquidation, particularly one of the considerable size and nature of that presented here, the Superintendent will take many steps that, while not specifically enumerated in the statute, must necessarily flow from the obligations and authority vested in him by the statute.

In keeping with this broad discretion, then, the failure to affirmatively reject deposits on the day of the seizure—or even the affirmative decision to accept them—cannot be said to violate the statute and exceed the Superintendent's authority. In fact, an argument could be made that rejecting a proffered deposit, or returning one, might actually violate the Superintendent's statutory obligation to take possession of all business and property. Even CITIC seems to acknowledge that acceptance of a deposit for an antecedent debt might have been proper, even as it maintains that deposits implicating repayment obligations should have been rejected. On the day of the seizure, however, the Superintendent was in no position to evaluate the status or purpose of incoming transactions (*see, Peterson v State of New York, supra*). Rather, consistent with his statutory obligation to collect and preserve assets within the State for the benefit of New York creditors, it was within his discretion to permit the acceptance of deposits (whether he did so explicitly or not, or with respect to this specific deposit), particularly where they were the result of an automatic transfer. Practically speaking, according to a BAI official, there was no way that BAI could have rejected incoming computer transfers that day, since they were automatically and directly transmitted to BAI's computer system.

It is also relevant to remember that the transaction agreed upon was a deposit with the Tokyo branch in Tokyo, where, according to the agreement of the parties, it was to begin earning a high rate of interest immediately (i.e., on July 5th, Tokyo time, before the business day began in New York). Thus, contrary to CITIC's arguments, the deposit was considered accepted and credited even as the dollars were in the act of being moved into a specific account pursuant to BCCI Tokyo's request.

We do not find support in the record for the inference that the Superintendent gave BAI specific instructions to accept this particular deposit, but, as discussed above, it would not have constituted an abuse of his discretion had he done so. The record seems to show that BAI officials acted upon the advice of the Federal Reserve representative in accepting deposits when they were unable to communicate with the Superintendent directly on this subject.

Moreover, we find no merit to CITIC's remaining arguments that, due to the seizure of BCCI, the contract was the result of a mistake of fact, or that it is entitled to a constructive trust. CITIC has made no showing of mistake; to the contrary, it made a deliberate business decision to continue doing business with BCCI (because it offered such a high rate of return), in the face of all the information at its disposal concerning BCCI's difficulties. That the risk of doing business with BCCI was all too fully realized in this single transaction does not constitute a mistake of fact such that CITIC is entitled to the immediate return of its money. Nor can CITIC prevail on the theory that it is entitled to a constructive trust. Under the circumstances, as in the case of IBJ, no wrongdoing has been demonstrated that would warrant such a remedy (*see, Simonds v Simonds, supra*).

Finally, while the IAS Court concluded that the deposit must be returned to CITIC, in reliance on *Friede v National City Bank*, 222 App Div 645, *affd* 250 NY 288) and *Finkelstein v Bank of U. S.* (142 Misc 403), we do not agree that the principles articulated therein compel the return of the disputed funds. In *Friede*, a nationalized Russian bank rejected a deposit to its correspondent New York bank account, where the funds were intended for an account at the Russian bank itself. Because the deposit was never accepted or credited by the Russian bank, it never became its property (250 NY, *supra,* at 293-295). This was not the case here, where the deposit was considered accepted and credited in Tokyo, where the transaction originated, and ultimately by BAI's computer system in New York. In addition, *Friede* did not involve a New York seizure pursuant to the New York State Banking Law. And, while we are not constrained to follow *Finkelstein*, a Kings County Supreme Court decision in which title to the proceeds of checks collected after a domestic bank takeover (predating the Banking Law) was found to remain in the depositor, we note there are contrary decisions (*see, e.g., Matter of Littman [Broderick]*, 258 NY 468, *cert denied* 287 US 663; *Carnegie Trust*

*Co. v First Natl. Bank,* 213 NY 301), and that, in any event, CITIC was doing business with BCCI Tokyo in Tokyo, not New York (where, the Superintendent points out, BCCI Tokyo was not even licensed to accept deposits).

Thus, IBJ and CITIC are in no better position than any other of BCCI's creditors. Rather than being the beneficiary of a profitable business deal, each became the victim of circumstance. Their money—whether on its way in or on its way out—was simply in the wrong place at the wrong time. This is the inherent risk in any business venture, no matter how "risk-free" it purports to be. That each one, in hindsight, may be able to identify a moment in the particular transaction when these consequences could have been averted does not change the result. Both IBJ and CITIC made a deliberate decision to do business with an entity in questionable financial condition, a fact of which both were aware, despite their protestations to the contrary. Now, each has recourse in the appropriate local or worldwide liquidation process to seek the funds at issue, and each has appropriately filed claims in the Tokyo and worldwide liquidations.

Accordingly, the order of the Supreme Court, New York County (Lewis J. Friedman, J.), entered June 14, 1995, which granted CITIC's motion for the return of funds with interest and denied the Superintendent's application for the release of said funds, is unanimously reversed, on the law and the facts, without costs, and the Superintendent's application for the release of said funds for use in the New York liquidation proceedings is granted. The order of the same court and Justice, entered June 14, 1995, which granted the Superintendent's application to retain the funds to which IBJ claimed entitlement, and denied IBJ's motion for the turnover of said funds, is unanimously affirmed, without costs.

ROSENBERGER, RUBIN, KUPFERMAN and MAZZARELLI, JJ., concur.

Order, Supreme Court, New York County, entered June 14, 1995, which granted CITIC's motion for the return of funds with interest and denied the Superintendent's application for the release of said funds, reversed, on the law and the facts, without costs, and the Superintendent's application for the release of said funds for use in the New York liquidation proceedings granted, and order, same court and Justice, entered June 14, 1995, which granted the Superintendent's ap-

plication to retain the funds to which IBJ claimed entitlement, and denied IBJ's motion for the turnover of said funds, is unanimously affirmed, without costs.