**UNITED STATES of America,**

v.

**BCCI HOLDINGS (LUXEMBOURG), S.A., Bank of Credit and Commerce International, S.A., Bank of Credit and Commerce International (Overseas) Limited, and International Credit and Investment Company (Overseas) Limited, Defendants.**

Crim. A. No. 91–0655 (JHG).

United States District Court,
D. Columbia.

April 22, 1997.

U.S. Dept. of Justice, Stefan D. Cassella, Deputy Director, Asset Forfeiture Office, Karen I. Meyer and John T. Stemplewicz, for Government.

Joseph Baio, Benito Romano, Wilkie Farr & Gallagher, Washington, DC, for American Express Bank, Ltd.

## MEMORANDUM OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

JOYCE HENS GREEN, District Judge.

Presently before the Court is the United States' Motion for Summary Judgment ("Mo-

tion for Summary Judgment") regarding the Petition of American Express Bank, Ltd., Pursuant to 18 U.S.C. § 1963(*l*) (1994) ("L–Claim"). This Court previously held that American Express Bank's exercise of its state law right of set off was sufficient to establish standing to assert a third-party claim under the criminal forfeiture provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Pub.L. No. 91–452, 84 Stat. 941 (1970), as amended, codified at 18 U.S.C. § 1961 *et seq. See United States v. BCCI Holdings (In re Petition of American Express Bank),* 941 F.Supp. 180 (D.D.C.1996). Because there is no genuine dispute regarding any material fact and the United States is entitled to judgment as a matter of law, the Motion for Summary Judgment will be granted, and American Express Bank's L–Claim will be dismissed.

### Background

The Court's previous opinion provided a detailed review of the historical background underlying the collapse of BCCI, *see In re Petition of American Express Bank,* 941 F.Supp. at 182–83, and only the facts material to the Motion for Summary Judgment will be repeated here. The following facts are not in dispute.

American Express Bank's L–Claim arises from a series of foreign currency exchange transactions with BCCI and from an uncollateralized loan that American Express Bank made to BCCI on April 25, 1991. The currency transactions were to be completed on or before July 5, 1991, but before the transactions were concluded, banking regulators froze BCCI's assets, including those at American Express Bank. On July 5, 1991, Michael Lesser, the Assistant Deputy Superintendent of the Foreign Commercial Banks Division of the New State Banking Department advised an official at American Express Bank that the Superintendent had taken possession of BCCI's businesses and property.[1]

---

1. This was not the only notice that American Express Bank received: "On the same day [July 5, 1991], the Federal Reserve Bank advised AEB [American Express Bank] and other banks of the suspension of BCCI accounts worldwide, including the seizure of BCCI's New York operations." *Sheerbonnet, Ltd. v. American Express Bank Ltd.,* 905 F.Supp. 127, 129 (S.D.N.Y.1995), *opinion corrected and superseded by* 1996 WL 221829 * 1 (May 1, 1996) (*Sheerbonnet II*). In *Sheerbonnet II*, as here, American Express Bank took a set off against BCCI's accounts after being told that BCCI's accounts were frozen. Unlike this case, however, the funds at issue in *Sheerbonnet* were

Mr. Lesser then transmitted to American Express Bank copies of the closing orders. At the time of the seizure, BCCI owed American Express Bank approximately $13,000,000 as a result of the foreign currency transactions. In addition, on July 8, 1991, BCCI's obligation came due to pay $10,052,743 on the uncollateralized loan of April 25, 1991.

On July 8th, with its accounts frozen by New York regulators, BCCI failed to pay American Express Bank the amounts due. American Express Bank then "exercised its right of set off as to the $22,848,928 in obligations owed to it by BCCI." Affidavit of Farhad Subjally ¶4 (July 21, 1992). On July 15, 1991, American Express Bank set off $500,000 more arising from foreign currency obligations, and on July 23, 1991, the bank set off $188,375 "arising from the need to secure cover in the open market." *Id; see* L–Claim ¶24.

■ In the year prior to the massive worldwide intervention seizing BCCI's assets, BCCI's financial and legal troubles were well publicized. Between January 1990 and July 8, 1991, more than 65 articles appeared in the Wall Street Journal and the New York Times.[2] These articles were saturated with reports of BCCI's fraudulent conduct including its guilty plea to money laundering charges and allegations of widespread corruption.[3] *See, e.g.,* "BCCI Unit Is Tied to Suit Alleging Insurance Fraud," Wall St. J., June 14, 1991; "The Americas: Peru—Another Link in the BCCI Money Laundering Chain?," Wall St. J., May 17, 1991; "Links Between First American, BCCI Spur Fed Speculation of Criminal Acts," Wall St. J., Feb. 22, 1991; "Noriega–Linked Bank Admits Laundering," Wall St. J., Jan. 17, 1990;

"2 Foreign Bank Units Plead Guilty to Money Laundering," N.Y. Times, Jan. 17, 1990.

Between July 5, 1991, when banking regulators intervened on an international scale, and July 8th, at least ten articles from the New York Times and the Wall St. Journal were devoted to the seizure of BCCI and the freezing of its assets. *See, e.g.,* "Regulators World–Wide Close Down BCCI Branches in a Coordinated Move," Wall St. J., July 8, 1991; "Huge Foreign Bank Faces Possible Collapse," N.Y. Times, July 8, 1991; "A Well Tarnished Bank," N.Y. Times, July 7, 1991; "Scandal Reveals Holes In Rules For Foreign Banks," N.Y. Times, July 7, 1991; "BCCI: Big Money and Mysteries" N.Y. Times, July 6, 1991; "7 Nations Charge 'Fraud' and Seize a Banking Empire," N.Y. Times, July 6, 1991; "Warnings Reportedly Given," N.Y. Times, July 6, 1991; "Reaction from the Fed," N.Y. Times, July 6, 1991.

On November 15, 1991, a three-count Indictment charging BCCI with conspiracy, wire fraud and racketeering was filed in this Court. On January 24, 1992, following findings of fact and conclusions of law with supporting reasons made in open court, this Court accepted the pleas of guilty of the four corporate defendants, collectively known as BCCI, and the Plea Agreement between them and the United States. *See* Transcript of Guilty Plea Proceedings (Jan. 24, 1992). In accordance with 18 U.S.C. § 1963, the Court then entered an Order of Forfeiture (as amended on January 31, 1992), which required American Express Bank to surrender BCCI's property at American Express Bank.

On February 14, 1992, pursuant to the Order of Forfeiture, as amended, American Express Bank transferred over $119 million

---

not alleged by the United States to be owned by BCCI. In *Sheerbonnet I,* after American Express Bank was advised that BCCI's funds were frozen, it credited BCCI's account pursuant to a letter of credit in which a third-party (Sheerbonnet, Ltd.) was the beneficiary. Sheerbonnet was never paid, because American Express Bank's set off short-circuited payment. *See* 905 F.Supp. at 136; *see also Sheerbonnet, Ltd. v. American Express Bank, Ltd.,* 17 F.3d 46, 48 (2nd Cir.) (reversing *Sheerbonnet I* on other grounds), *cert. denied,* 513 U.S. 813, 115 S.Ct. 67, 130 L.Ed.2d 23 (1994). In *Sheerbonnet I,* the court ultimately

denied American Express Bank's motion to dismiss Sheerbonnet's complaint. *See* 1996 WL 221829 *15.

2. The Court takes judicial notice of these articles. Fed.R.Evid. 201(b); *see The Washington Post v. Robinson,* 935 F.2d 282, 291 (D.C.Cir.1991).

3. Between October 11, 1988 and July 23, 1991 (when the petitioner exercised the last of three set offs), 105 articles relating to BCCI and its troubles appeared in the Wall St. Journal alone.

to the United States Marshals Service. This amount represented what American Express Bank contended was the balance (or net) in BCCI's account after the bank set off the $23,537,303 at issue here for debts that BCCI owed. After withholding the set off amount, American Express Bank filed a motion for a temporary restraining order and requested a hearing.

The Court granted American Express Bank's request for a hearing, but rejected its arguments at that hearing. Thereafter, American Express Bank transferred the remaining amount of $23,537,303 to the United States Marshal, and then petitioned this Court to amend the Order of Forfeiture as to that set off amount.

■ Through its five-count L–Claim, American Express Bank now claims title to, and seeks the return of, $23,537,303, contending that it owned this sum pursuant to lawful set offs taken against BCCI before the Order of Forfeiture was entered. In Count I, the bank contends that the set off amount is its property and, therefore, the set off amount is not subject to forfeiture.[4] In Counts II and III, the petitioner stakes its entitlement to the set off amount by claiming, under 18 U.S.C. § 1963($l$)(6)(A), that its rights were vested or superior to BCCI's (Count II) and by contending that, under 18 U.S.C. § 1963($l$)(6)(B), it was a bona fide purchaser for value reasonably without cause to believe at the time of purchase that the property was subject to forfeiture (Count II). Count IV seeks protection from conflicting demands made to the petitioner by BCCI's regulators throughout the world to the set off amount[5] and Count V contends that the Order of Forfeiture violated American Express Bank's constitutional rights.[6]

On September 20, 1996, this Court denied the United States' motion to dismiss. *See In re Petition of American Express Bank,* 941 F.Supp. at 189. While the Court held that American Express Bank's exercise of its state law statutory right of set off was sufficient to establish standing, the Court did not reach the merits of the motion to dismiss, offering the petitioner a hearing pursuant to 18 U.S.C. § 1963($l$)(5). *Id.* However, the petitioner consented to a procedure in which the United States would first file its motion for summary judgment. If the L–Claim survived summary judgment, a hearing would be held. On October 23, 1996, a Scheduling

---

4. The argument contained in this count is, of course, the entire ball game. If the set off amount constitutes American Express Bank's property, it is not subject to forfeiture. If it is BCCI's property, then it has been properly forfeited. *See United States v. Lester,* 85 F.3d 1409, 1412 (9th Cir.1996); *United States v. BCCI Holdings (In re Petition of the General Secretariat of American States),* 73 F.3d 403 (D.C.Cir.1996), *cert. denied sub nom. General Secretariat of the Organization of American States v. United States,* — U.S. ——, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996). Because the merit, if any, of Count I turns upon the application of 18 U.S.C. § 1963($l$), it is subsumed within the discussion regarding Counts II and III (applying Subsections 1963($l$)(6)(A) and (B)). The Court will not, therefore, address Count I separately.

5. This count warrants no further discussion because courts have no such equitable authority under 18 U.S.C. § 1963. Even if they did, however, no relief would be warranted because sophisticated international banks assume a risk that foreign liabilities will arise when they voluntarily engage in business with foreign corporations. *See United States v. Bank of Nova Scotia,* 740 F.2d 817, 828 (11th Cir.1984), *cert. denied,* 469 U.S. 1106, 105 S.Ct. 778, 83 L.Ed.2d 774 (1985).

6. In its earlier pleadings, American Express Bank also argued that by the time of the forfeiture it had dissipated the set off funds and, therefore, that the United States was barred from seeking substitute assets from a third party. *See* Notices to the Court of New Authority (citing *In re Moffitt, Zwerling & Kemler, P. C.,* 846 F.Supp. 463 (E.D.Va.1994), *aff'd sub nom. United States v. Moffitt, Zwerling & Kemler, P.C.,* 83 F.3d 660 (4th Cir.1996), *cert. denied,* — U.S. ——, 117 S.Ct. 788, 136 L.Ed.2d 730 (1997); *In re Moffitt, Zwerling & Kemler, P.C.,* 875 F.Supp. 1152 (E.D.Va.1995), *aff'd in part and rev'd in part sub nom. United States v. Moffitt, Zwerling & Kemler, P. C,* 83 F.3d 660 (4th Cir.1996), *cert. denied,* — U.S. ——, 117 S.Ct. 788, 136 L.Ed.2d 730 (1997); and *In re Moffitt, Zwerling & Kemler, P.C.,* 875 F.Supp. 1190 (E.D.Va.1995), *aff'd in part and rev'd in part sub nom. United States v. Moffitt, Zwerling & Kemler, P.C.,* 83 F.3d 660 (4th Cir.1996), *cert. denied,* — U.S. ——, 117 S.Ct. 788, 136 L.Ed.2d 730 (1997)). While it is not clear whether American Express Bank is reasserting this argument in opposing summary judgment, the argument is nevertheless addressed infra.

Order was issued, and on January 29, 1997, the motion for summary judgment became ripe.[7]

## Discussion

BCCI's assets were forfeited pursuant to 18 U.S.C. § 1963,[8] which sets forth an orderly procedure by which third parties seeking to recover interests in forfeited property may obtain judicial resolution of their claims. It permits any person, other than the defendant, claiming a legal interest in forfeited property to petition the Court for a hearing to adjudicate the validity of that interest. 18 U.S.C. § 1963(*l*)(2).[9] Section 1963(*l*)(6) sets forth the substantive elements that a third party must establish to obtain amendment of an order of forfeiture:

If, after the hearing, the court determines that the petitioner

has established by a preponderance of the evidence that—

(A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right,

file, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or

(B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section;

the court shall amend the order of forfeiture in accordance with its determination.

18 U.S.C. § 1963(*l*)(6).

A petitioner must first establish standing. Only by establishing standing and alleging the requisite elements of either § 1963(*l*)(6)(A) or § 1963(*l*)(6)(B) may a party obtain judicial relief from an order of forfeiture. *See United States v. BCCI Holdings (Luxembourg), S.A., et al. (In re Petition of Chawla)*, 833 F.Supp. 9, 13 (D.D.C. 1993), *aff'd*, 46 F.3d 1185, 1188 (D.C.Cir.), *cert. denied sub nom. Chawla v. United States*, — U.S. —, 115 S.Ct. 2613, 132 L.Ed.2d 856 (1995); *United States v. Schwimmer*, 968 F.2d 1570, 1584 (2nd Cir. 1992); *United States v. Lavin*, 942 F.2d 177, 187 (3rd Cir.1991). While an unexercised

---

7. Both parties have requested oral argument on the motion for summary judgment. Whether to hold oral argument is a question committed to the discretion of the Court, *see* Local Rule 108(f), and, in this instance, the Court has determined that oral argument would not be helpful to resolving the motion for summary judgment. The parties have extensively briefed these issues through the voluminous pleadings supporting and opposing the motion to dismiss, which raised the same issues as the instant motion for summary judgment (which also has been well-briefed). Moreover, oral argument was held on the motion to dismiss. It is not apparent to the Court what value oral argument would add at this stage nor have the parties offered any explanation as to why it is necessary or even why it would be helpful.

8. 18 U.S.C. § 1963(a) provides, in relevant part:

Whoever violates any provision of section 1962 of this chapter shall ... forfeit to the United States, irrespective of any provision of State law—

(1) any interest the person has acquired or maintained in violation of section 1962;

(2) any—

(A) interest in;

(B) security of,

(C) claim against; or

(D) property or contractual right of any kind affording a source of influence over;

any enterprise which the person has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962; and

(3) any property constituting, or derived from, any proceeds which the person has obtained directly or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962.

The court, in imposing sentence on such person shall order ... that the person forfeit to the United States all property described in this subsection.

9. This provision provides:

Any person other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States pursuant to this section may, within thirty days of the final publication of notice or his receipt of notice under paragraph (1), whichever is earlier, petition the court for a hearing to adjudicate the validity of his alleged interest in the property. The hearing shall be held before the court alone, without a jury.

right of set off leaves a bank in the position of a general creditor, *see United States v. BCCI Holdings (Luxembourg), S.A., et al. (In re Petition of Security Pacific Int'l Bank),* —— F.Supp. ——, 1997 WL —— slip op. at 9 (D.D.C. Jan. 17, 1997), the timely exercise of a state law statutory right of set off, as occurred here, is sufficient to establish standing. *In re Petition of American Express Bank,* 941 F.Supp. at 189.

■ Although the existence and nature of American Express Bank's legal interest in the property is determined by reference to state law, federal law provides the rule of decision in determining the consequences of such an interest. *United States v. National Bank of Commerce,* 472 U.S. 713, 722, 727, 105 S.Ct. 2919, 2925, 2927–28, 86 L.Ed.2d 565 (1985); *United States v. Lester,* 85 F.3d 1409, 1412 (9th Cir.1996); *United States v. Infelise,* 938 F.Supp. 1352, 1357 (N.D.Ill.1996). American Express Bank's right of set off under state law may allow it to enjoy a preferred position against competing state law claims, but it does not guarantee any such preference under federal law. *See, e.g., Aurora Maritime v. Abdullah Mohamed Fahem & Co.,* 85 F.3d 44, 48 (2nd Cir.1996); *United States v. Sterling Nat. Bank & Trust Co.,* 494 F.2d 919, 922 (2nd Cir.1974). And, American Express Bank must do more than merely demonstrate standing before the Court can grant a motion to amend the Order of Forfeiture. *See United States v. Alcaraz–Garcia,* 79 F.3d 769, 774 n. 10 (9th Cir.1996).

Summary judgment is appropriate when there is "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are any genuine issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505,

2511, 91 L.Ed.2d 202 (1986). The role of the Court on a motion for summary judgment is not to weigh the evidence, but to determine whether genuine issues of material fact exist for trial. *Abraham v. Graphic Arts Int'l Union,* 660 F.2d 811, 814 (D.C.Cir.1981). To survive summary judgment, the nonmoving party must offer more than mere allegations, *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11, by going "beyond the pleadings and by its own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If the material facts proffered by the nonmoving party are subject to diverse interpretations, summary judgment is not available. *Tao v. Freeh,* 27 F.3d 635, 638 (D.C.Cir.1994). Any doubts must be resolved in favor of the nonmoving party, *Abraham,* 660 F.2d at 815, and the nonmoving party is entitled to all justifiable inferences. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14. Since there is no genuine dispute as to any material fact,[10] summary judgment is appropriate, Fed. R.Civ.P. 56; *see Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511, and the question is simply whether under 18 U.S.C. § 1963($l$)(6) the United States is entitled to judgment as a matter of law.

In moving for summary judgment on Count II, the United States contends that American Express Bank cannot, under 18 U.S.C. § 1963($l$)(6)(A), demonstrate that its right, title or interest was vested or superior to BCCI's at the time BCCI committed the offenses leading to the criminal forfeiture. *See* Motion for Summary Judgment at 6–8. Second, the United States moves for summary judgment on Count Ill, arguing that, under 18 U.S.C. § 1963($l$)(6)(B), the bank is not a bona fide purchaser which, at the time of the purchase, was reasonably without cause to believe that the property was subject to forfeiture. *Id.* at 9–14.

The Court will also address two arguments raised by the petitioner in its opposition to

---

10. The only disputed facts identified by American Express Bank are not material to resolving the United States' Motion for Summary Judgment. *See* Statement of Genuine Issues of Material Disputed Facts Pursuant to Local–Rule 108(h) (disputing paragraphs 3 and 12 of the United States' Statement of Material Undisputed Facts). Summary judgment is therefore appropriate.

the motion to dismiss, but which were not ruled on by the Court in denying that motion. These arguments have been raised indirectly in American Express Bank's opposition to the motion for summary judgment, and it is appropriate to address them here. Specifically, American Express Bank has challenged the constitutionality of the RICO criminal forfeiture provisions, and it contends that the government cannot seize the set off finds because those funds were dissipated prior to entry of the Order of Forfeiture. *See* L–Claim ¶¶ 52–53; Opposition to Motion to Dismiss at 4344; Notice to the Court at 5–7 (Nov. 23, 1994); Opposition to Motion for Summary Judgment at 16–18.

**Subsection 1963(*l*)(6)(A)**

■ To prevail under 18 U.S.C. § 1963(*l*)(6)(A), the United States must demonstrate that, as a matter of law, American Express Bank cannot show that it has a legal right, title, or interest in the property which was vested in the petitioning bank or superior to BCCI's interest at the time BCCI committed the acts that gave rise to the forfeiture of the property. Under the statute, the relevant time period is, of course, when BCCI committed the criminal acts leading to the forfeiture of its assets. The problem for American Express Bank is therefore obvious. While the bank may have enjoyed a right of set off under New York law against BCCI's accounts, it did not exercise that right until July 8, 1991. Because the set offs were taken *after* BCCI committed the acts that gave rise to forfeiture, American Express Bank cannot prevail under Subsection (*l*)(6)(A), and the United States is entitled to judgment as a matter of law.

In its opposition, American Express Bank attempts to shift the temporal focus to the date of forfeiture. *See* Opposition to the Motion for Summary Judgment at 10 & 16. The bank argues that it acquired its interest prior to the date that the amended Order of Forfeiture was entered. This may be true, but it does not matter for the purposes of 18 U.S.C. § 1963. American Express Bank's

argument fails simply because it is contrary to the text and the legislative history of Subsection (*l*)(6)(A). The statute plainly requires that a petitioner demonstrate that its interest was vested or superior *"at the time of the commission of the acts."* 18 U.S.C. § 1963(*l*)(6)(A) (emphasis added); *see also id* § 1963(c).[11]

These provisions reflect Congress's concern that a defendant, aware of a pending investigation or indictment, would attempt to transfer the property to a third party before the defendant could be convicted and an order of forfeiture entered. Thus, Congress provided in 18 U.S.C. § 1963(c) that the critical time for evaluating the defendant's interest was at the time of the commission of the criminal offense. Any attempt by the defendant thereafter to transfer an interest in the property to a third party—or any attempt by a third party to acquire an interest in the defendant's property—would be void, unless the third party was a bona fide purchaser under Subsection (*l*)(6)(B).

The legislative history is as clear as the plain language of the statute. The Senate Report on the 1984 amendments states:

> Subsection (c) of 18 U.S.C. § 1963, as amended by the bill, is a codification of the 'taint' theory that has long been recognized in forfeiture cases. Under this theory, forfeiture relates back to the time of the acts which give rise to the forfeiture. The interest of the United States in the property is to vest at that time, and is not necessarily extinguished simply because the defendant subsequently transfers his interest to another. *Absent application of this principle a defendant could attempt to avoid criminal forfeiture by transferring his property to another person prior to conviction.*

S.Rep. No. 255, 98th Cong., 1st Sess. 200–01 (1983) (emphasis added.)

■ The legislative regime is both unambiguous and internally consistent. If the defendant commits an act that gives rise to the forfeiture of his property, that property

---

**11.** In relevant part, this provision provides that "[a]ll right, title and interest in property described in subsection (a) vests in the United States upon *commission of the act giving rise to forfeiture* under this Section." *Id.* (emphasis added).

may be forfeited even if another person acquires an interest in the property *before the defendant is convicted.* The relevant time is when the criminal acts were committed, not when the defendant was convicted or when the Order of Forfeiture was entered. *See United States v. Moffitt, Zwerling & Kemler, P. C.,* 83 F.3d 660, 668 & 670 (4th Cir.1996), *aff'g* 846 F.Supp. 463 (E.D.Va.1994) and *rev'g in part and aff'g in part* 875 F.Supp. 1152 (E.D.Va.1995) and 875 F.Supp. 1190 (E.D.Va. 1995); *United States v. Ginsburg,* 773 F.2d 798, 803 (7th Cir.1985) (en banc), *cert. denied,* 475 U.S. 1011, 106 S.Ct. 1186, 89 L.Ed.2d 302 (1986); *see, e.g., Infelise,* 938 F.Supp. at 1357, 1362, 1367 & n. 7; *United States v. Sokolow,* 1996 WL 32113 *17 (E.D.Pa.1996), *aff'd,* 81 F.3d 397 (3rd Cir. 1996); *Rashid v. United States,* 1996 WL 421855 * 1 (E.D.Pa.1996). Attempts by third parties to acquire an interest later are void unless the third party is a bona fide purchaser for value under Subsection 1963(*l*)(6)(B). *See, e.g., United States v. Scardino,* 956 F.Supp. 774, 780 (N.D.Ill.1997); *Infelise,* 938 F.Supp. at 1352, 1362 & 1368.

Here, there is no dispute that the set off amount existed as a credit in BCCI's account at American Express Bank on July 5, 1991, when BCCI was shut down by banking regulators. It was not until July 8, 1991, that American Express Bank exercised its state law right of set off, thus acquiring a cognizable legal interest. *See In re Petition of Security Pacific Int'l Bank,* slip. op. at 9 (prior to exercise, right of set off is inchoate and insufficient to establish a cognizable property interest); *In re Petition of American Express Bank,* 941 F.Supp. at 187–89 (same). Because the petitioner's interest was inchoate until July 8th, a date well after the commission of the acts leading to forfeiture, American Express Bank cannot prevail under Subsection (*l*)(6)(A). American Express Bank's right, if any, to the set off amount depends upon the provisions of Subsection (*l*)(6)(B).

**Subsection 1963(*l*)(6)(B).**

■ American Express Bank's attempts to seek the protection of Subsection (*l*)(6)(B) are equally unavailing. The plain language of the statute protects only bona fide *pur-*

chasers for value. *United States v. BCCI Holdings (In re Petitions of Trade Creditors),* 833 F.Supp. 22, 28 (D.D.C.1993), *aff'd,* 48 F.3d 551 (D.C.Cir.), *cert. denied sub norm. Liquidation Comm'n for BCCI (Overseas) Ltd, Macau v. United States,* —— U.S. ——, 116 S.Ct. 563, 133 L.Ed.2d 489 (1995). Whether American Express Bank is a bona fide purchaser for value is, once again, a question of federal law, and the bank's reliance upon state law and non-binding decisions by other federal courts is misplaced. This Court has previously held that Section 1963(*l*)(6)(B) does not apply to all arms' lengths transactions, but only to those transactions involving the purchase of tangible property. *Id* at 28.

■ Here, there simply has been no purchase. The assertion of a state law right of set off against BCCI's accounts for debts owed is both functionally and legally different from the purchase of a tangible asset. The *res* at issue is not the money that was the subject of the loan or the currency transactions, but the right for American Express Bank to take a credit for debts owed arising from the loan default and the incomplete currency transactions. All the bank acquired through its contractual dealings with BCCI was a cause of action for breach of contract and a right of set off under New York law. Acquisition of these legal rights is not a purchase within the meaning of Subsection (*l*)(6)(B). *See In re Petition of Chawla,* 46 F.3d at 1185; *In re Petition of Security Pacific Int'l Bank,* slip op. at 9; *In re Petitions of Trade Creditors,* 833 F.Supp. at 28.

■ Even if American Express Bank fit the definition of a bona fide purchaser for value, the Court could not find that a genuine issue of material facts exists as to whether the petitioner was *"reasonably* without cause to believe that the property was subject to forfeiture." 18 U.S.C. § 1963(*l*)(6)(B) (emphasis added). In its attempts to create a factual dispute, the petitioner has elected to ignore the word "reasonably," stating again and again that it did not have cause to believe that the property was subject to forfeiture. However, actual notice is not required. Nor does the statute require that American

Express Bank be put "on notice that every United States asset of BCCI *would* be forfeited to the United States in January, 1992." American Express Bank's Supplemental Memorandum of Points and Authorities in Opposition to the Motion to Dismiss at 12 (emphasis added). The standard is one of objective reasonableness.

In this case, American Express Bank reasonably should have known that BCCI's assets were subject to forfeiture based on matters published in the public record. BCCI's troubles were widely reported in, *inter alia*, prominent New York newspapers in 1990 and 1991. *See* Motion for Summary Judgment at App. B. The government has listed thirty-four articles in the Wall Street Journal and thirty-one articles in the New York Times that describe BCCI's criminal and fiscal improprieties, including articles specifically addressing the intervention on July 5, 1991. Given the extensive public record of BCCI's misconduct, American Express Bank knew or should have known that BCCI's assets were subject to forfeiture. Excerpts from some of those articles make clear that the bank's claim that it was not aware of BCCI's criminal and fiscal troubles jeopardizing BCCI's assets is simply not reasonable:

> October 11, 1988—"A government official familiar with the criminal investigation said the money-laundering probe—involving [BCCI] branches in London, the Cayman Islands, Nigeria and several of the other 69 countries in which the bank has offices—is one of the largest U.S. undercover inquiries into suspected international narcotics trafficking in recent years." Pasztor & Truell, "U.S. May Accuse Aides of Bank in Luxembourg," Wall. St. J.

> October 12, 1988—"A statement issued by Customs Service Commissioner William Von Raab carried a stern warning to banks, 'I'm putting the banking industry on notice—business with crooks is a crime,' he said. In an earlier briefing, Mr. Von Raab told reporters that the charges against BCCI are serious enough to cause its operations in Britain, France and other countries to be closed down by local authorities." Pasztor, "BCCI, 2 Units, 9

Bank Officials Charged with Conspiracy to Launder $32 Million," Wall St. J.

> October 12, 1988—"The sheer volume of the drug trade raises suspicions that many other financial institutions—wittingly or unwittingly—are being used for money-laundering. Mr. Von Raab's warning appeared to inspire some kind of self-policing responsibility on the banks. The 'bottom line,' he said, is 'whatever kind of financial institution you are, if you have crooks for customers, you are a crook.'" *Id.*

> October 28, 1988—Reporting that the widening drug and money-laundering probe of BCCI had spread to include subpoenas against 40 banks and 85 people. McCoy, "Bank America Unit Data Subpoenaed in Cocaine Probe," Wall St. J.

> December 16, 1988—"Bank of Credit and Commerce International Holdings S.A. operated a fictitious branch in the Bahamas and routinely flouted U.S. and Jamaican currency regulations, according to a former bank employee." Truell, "Luxembourg Bank Perpetrated Fraud, Ex–Worker Alleges," Wall St. J.

> July 7, 1989—Reporting that "[f]our people pleaded guilty in a federal drug and money-laundering case in which executives of BCCI Holdings S.A. also have been indicted," and that "[i]n a separate but related case, 11 executives either of BCCI Holdings, based in Luxembourg, or its subsidiaries, which include Bank of Credit and Commerce International, were charged with conspiring with international cocaine smugglers to launder millions of dollars of drug profits." "Four Plead Guilty In Drug Case Tied To BCCI Holdings," Wall St. J.

> April 30, 1990—Reporting that massive loans by BCCI were "made necessary by losses from unsecured or poorly collateralized loans." Truell & Fialka, "BCCI Had Huge 1989 Loss, Will Unveil Infusion of $500 Million, Sources Assert," Wall St. J.

> May 3, 1990—"For years, Bank of Credit and Commerce International chased the fast buck. If deposits from drug dealers were proffered, the bank only asked: How much?" Fialka & Truell, "Rogue Bank:

BCCI Took Deposits From Drugs, Noriega, and Now Is In The Red," Wall St. J.
**May 3, 1990**—"The convulsions at BCCI are the latest chapter in a shadowy history that ultimately created the world's biggest rogue bank. 'This bank is offshore at all points,' grumbles one U.S. state investigator, who, along with House, Senate, Justice and Treasury Department officials is trying to piece together BCCI's U.S. connections." *Id.*

**May 3, 1990**—"Of greatest interest is how BCCI surfed on the edge of one of the big financial waves of the 1980s: The hot money generated by the cocaine industry. According to Michael L. Rubinstein, a federal prosecutor in the money-laundering case, BCCI has been guided by a policy that 'came down from the highest levels of the bank to take in as many deposits as you can, as fast as you can, and not to be too careful about where they came from.'" *Id.*

**October 11, 1990**—"The resignation of BCCI's top officers came the same day that two senior financiers were sentenced in London for money-laundering offenses." Truell, "Turmoil at Bank of Credit and Commerce International Continues as Two Top Executives Resign," Wall St. J.

**February 20, 1991**—Reporting the criminal referrals concerning misrepresentations related to BCCI's ownership of First American Bank. Truell, "Fed Makes Criminal, Civil Referral to U.S. Regarding First American Unit" Wall St. J.

**February 21, 1991**—"Investigations of this kind are highly unusual and reflect regulators' concerns about the soundness of rules and practices governing the oversight of international institutions." Truell, "Fed Says It Is Investigating Relationship of BCCI With First American Bank" Wall St. J.

**February 22, 1991**—"Mr. Morgenthau's office in New York started investigating BCCI in April 1989 after he heard allegations that the bank had been laundering money from the sale of illegal drugs in New York." Truell, "Links Between First American, BCCI Spur Fed Speculation of Criminal Acts," Wall St. J.

**February 25, 1991**—Reporting negotiations "to overhaul BCCI's troubled worldwide operations," including illegal acquisition of First American Bank, money laundering in Florida and a continuing inquiry into BCCI's money laundering in New York, at Centrust Bank of Miami and at Independence Bank of Encino, California. Truell, "Fed and BCCI in Talks on Divestiture," Wall St. J.

**April 15, 1991**—"Sen. John Kerry asked Federal Reserve Chairman Alan Greenspan for a comprehensive report on BCCI Holdings (Luxembourg) S.A. and its related U.S. entities, and urged the Fed to take a tough stance in its investigation of the growing international bank scandal." Truell, "Sen. Kerry Asks Fed for a Report on BCCI Holdings," Wall St. J.

**April 25, 1991** [12]—Describing the apparent link between BCCI and drug trafficking/money laundering in Argentina. Melloan, "The Argentine Connection," Wall St. J.

**May 13, 1991**—Describing the investigation by the government of Peru into links between BCCI and a former Peruvian president, who was accused of corruption. Truell & De Cordoba, "Peru Seeks Aid of U.S. in Probe of Ex–President: Commission is Investigating Links Between Garcia and Accounts at BCCI," Wall St. J.

**May 17, 1991**—"[I]t is becoming apparent that several Latin American governments quietly have been collaborating with the Luxembourg-based Bank of Credit and Commerce International to a far greater extent than anyone had imagined." Vargas Llosa, "The Americas—Peru: Another Link in the BCCI Money–Laundering Chain?" Wall St. J.

**May 23, 1991**—Describing BCCI's role in the illegal financing of First American Bank and reporting that "[t]he Price Waterhouse report details a whole roster of problems with BCCI's loan book and procedures, portraying BCCI records on the

---

**12.** On this day, American Express Bank entered into the uncollateralized loan agreement with BCCI which led to one of the set offs (asserted in July of 1991) at issue here.

loans as a shambles." Truell, "New Questions Raised About Financing First American Bankshares by BCCI," Wall St. J.

**June 13, 1991**—"Scandal roils about the Bank of Credit and Commerce International, one of the largest and certainly the strangest privately owned banks in the world. Pakistanis run it; Arab oil sheiks own it; the Duchy of Luxembourg charters it; and until recently it made its home in London. In early 1989, it pleaded guilty to drug money laundering after a long U.S. government sting and a spectacular takedown disguised as a bachelor party for the lead undercover Customs agent. Then it turned out the bank had been cultivating Washington influence for years, with one of the capital's best known insiders on its payroll." Adams, "BCCI Scoreboard: The Players," Wall St. J.

**June 13, 1991**—"Now it seems that for nearly a decade, BCCI may have secretly, and illegally, controlled First American Bankshares, the largest bank holding company headquartered in Washington, D.C. The chain, with similarly named subsidiaries in the D.C. region, New York, Georgia and Florida, is held by First American Corp., run by Clark Clifford and Robert Altman. Mr. Clifford helped a group of Arab investors acquire the chain in 1982, after a four-year hostile takeover. As acquisition vehicles, the investors used shell corporations called Credit and Commerce American Investment, B.V. Recent revelations that these shares were purchased with loans from BCCI and then taken as collateral for the loans has fed suspicions, first raised in 1978, that the whole transaction was a front to enable BCCI to control a chain of American banks." Id.

**June 13, 1991**—Describing Ghaith Pharaon's role in BCCI's activities and that he "has become a focus of the BCCI-related investigations being conducted by the Manhattan district attorney, a grand jury in Miami, the Federal Reserve's enforcement division and, most recently, the Justice Department." Truell, "The Front Man: How a Saudi Helped BCCI Scandal Spread From Miami to Encino," Wall St. J.

**June 14, 1991**—Reporting that "[a] unit of scandal-plagued BCCI Holdings (Luxembourg) S.A. is at the heart of a complex affair involving allegations of insurance fraud, smuggled coffee shipments and illegal arms dealings." Truell, "BCCI Unit is Tied to Suit Alleging Insurance Fraud," Wall St. J.

**June 20, 1991**—Stating that since 1987, while Price Waterhouse was BCCI's sole auditor, BCCI, "because of continued faulty—and possibly fraudulent—lending and banking practices, as well as a lack of record-keeping, has lost several billion dollars." Truell & Berton, "Price Waterhouse Affiliate Omitted Concerns Over Lending in BCCI Audit" Wall St. J.

**June 24, 1991**—"BCCI, or Bank of Credit & Commerce International, is currently under investigation by government attorneys in New York, Florida and Washington, D.C. According to investigators and bank regulators, the bank has lost several billion dollars. BCCI pleaded guilty to money-laundering in federal court in Tampa, Fla., in January 1990." Berton, "Price Explains U.K. Affiliate's BCCI Opinion," Wall St. J.

**June 26, 1991**—"A federal judge in Miami held a unit of BCCI Holdings (Luxembourg) S.A. in civil contempt and ordered it fined $50,000 a day for failing to produce subpoenaed documents." Truell, "BCCI Unit Found in Civil Contempt, Told to Pay Fine," Wall St. J.

**June 27, 1991**—Sen. John Kerry, in a Letter to the Editor, states that he has "worked to expose the truth about BCCI's ties to international drug trafficking and money laundering, and its relationship to U.S. banks." Kerry, "Our Dogged Probe of BCCI Scandal," Wall St. J.

**July 6, 1991** [13]—"BCCI is now being portrayed by law enforcement officials as an international money-laundering operation that has defrauded depositors and duped

---

**13.** On the previous day, the banking regulators intervened and took possession of BCCI's assets. American Express Bank was provided notice on that day by the Superintendent of Banks in New York and the Federal Reserve. *See supra.*

government regulators throughout the world." Baquet, "BCCI: Big Money and Mysteries," N.Y. Times.

**July 6, 1991**—Reporting that "evidence indicated that the fraud involved 'people at a very high level in the bank.'" Baquet, "7 Nations Seize Bank Empire Accused of Fraud," N.Y. Times.

**July 7, 1991**—Stating that BCCI's customers included drug traffickers and arms dealers. Gerth, "Scandal Reveals Holes In Rules For Foreign Banks," N.Y. Times.

**July 8, 1991** [14]—"Bankers will begin to feel pain this morning. According to Bank of England officials, around $2 billion of BCCI's Luxembourg units' exposure are in interbank liabilities. *But bankers who did business with BCCI knew perfectly well that they were taking a risk,* noted Robin Munro–Davies, managing director of the London-based rating agency IBCA, Ltd., so they're likely to get little sympathy. Because of its complex structure, he said, 'BCCI was a high risk institution which did not have a lender of last resort. Any institution which had funds at BCCI was either being totally dilatory or taking a short-term risk and got it wrong. There will be no pressure to support these institutions.'" Truell & Bray, "Regulators World–Wide Close Down BCCI Branches in a Coordinated Move," Wall St. J. (emphasis added).

**July 8, 1991**—"Additional losers will emerge if the BCCI scandal spreads, as it appears likely to do. At least four grand jury investigations are underway in the U.S. In addition, the Bank of England said it has turned over to Britain's Serious Fraud Office the Price Waterhouse Report on BCCI that prompted Friday's crackdown. That report provided evidence of fraud in areas controlled both by BCCI's Luxembourg subsidiary and its Cayman Islands operation." *Id.*

**July 8, 1991**—"The Morgenthau investigation and others promise to move more swiftly now that regulators have seized some of BCCI's most important records.

Also, current and former BCCI staffers, many of them now unemployed, are expected to be more willing to talk. A wave of additional regulatory and legal actions against BCCI and its coterie now appears likely." *Id.*

**July 9, 1991**—Reporting that "[a]lleged fraud at Bank of Credit & Commerce International appears to have left the banking group with a shortage of more than $4 billion." Also reporting that "[t]he Bank of England earlier had asked auditors Price Waterhouse to prepare a report on BCCI's health. After the report was delivered on June 27, a spokesman for the central bank said there was no question of allowing BCCI to continue operating. 'The capital question is secondary,' he said. **'The primary thing is that we had evidence of fraud on a widespread scale.'"** Bray, "BCCI Shortage May Exceed $4 Billion as a Result of Alleged World–Wide Fraud," Wall St. J. (emphasis added).

**July 12, 1991**—Reporting that "[t]o raise money to find [BCCI's] questionable loans and to plug holes in its balance sheets, BCCI frantically scrambled to raise deposits, some of which appear to have gone into a secret bank-within-the-bank and were never recorded on its books. It began routinely to collect deposits from traffickers in drugs, traffickers in arms, tax evaders and others seeking shelter from the law." Truell, "Money Trail: How BCCI Took From Depositors, Gave Billions to the Rich—Secret Auditors' Report Shows Arab Sheiks Got Loans Without Collateral—The Mysterious Mr. Khalil," Wall St. J.

**July 12, 1991**—Reporting that "in Manhattan, District Attorney Robert Morgenthau, who has spearheaded the investigation of BCCI and First American for close to two years, is expected to seek indictments of many people involved in the affair. Another of the four grand juries looking into BCCI is expected to recommend action soon concerning the bank's links with Cen-

---

**14.** This is the day that American Express Bank took the first (and largest) of its three set offs against BCCI accounts.

Trust Bank of Miami, Florida's costliest savings and loan failure." *Id*

**July 15, 1991** [15]—Reporting that government and congressional investigators are investigating BCCI's ties to covert activities; that the Bank of England cited "widespread fraud going back many years as the reason for shutting down BCCI," and that BCCI "has come under increasing scrutiny in recent years for a growing number of illegal acts, including money-laundering, violating various banking and foreign exchange regulations, and involvement with arms and drug smugglers." Truell, "Fed Seeks Bar on 3 Ex–Officers of BCCI, Pharaon; Bank's CIA Ties are Probed," Wall St. J.

**July 17, 1991**—Describing payoffs to BCCI executives reported in an April 1991 draft Price Waterhouse report. Truell & Bray, "BCCI Officials Said to have Received Payoffs to Stay Silent About Misdeeds," Wall St. J.

**July 18, 1991**—Discussing, *inter alia*, the investigation opened by Japan's central bank into the Tokyo branch of BCCI Holdings due to the growing BCCI scandal. "Effects of BCCI Scandal Spread to Asia as Depositors Fret About Possible Losses," Wall St. J.

**July 19, 1991**—Reporting that the name of BCCI's principal financier, Sheik Zayed, "has been linked with the bank's alleged fraud, as well as with its drug connections and mismanagement." Brooks, "Sheik Zayed Led Abu Dhabi to Riches and Remains a Hero—But BCCI Scandal is a Cloud Over His Long Reign; Blame for Biggest Holder," Wall St. J.

**July 22, 1991**—Describing protest at BCCI's Hong Kong branch after government officials placed the bank in liquidation as a result of the growing scandal. "BCCI Depositors Protest," Wall St. J.

**July 22, 1991**—Reporting that BCCI had been under investigation by British intelligence for over a year because of alleged links to terrorism. Bray, "BCCI Report-

edly Was Being Examined for Alleged Links to Terrorist Groups," Wall St. J.

**July 23, 1991** [16]—Discussing British judge's decision freezing the government's liquidation "as the scope of the apparent fraud [was becoming] even wider at BCCI, whose principal operating company is BCCI holdings." Bray & Truell, "Judge Halts Liquidation of BCCI's U.K. Operations—Sham Accounts, Secret Role of First American Bank Are Alleged at Hearing," Wall St. J.

Despite these extensive and alarming articles, published in New York's major newspapers, American Express Bank argues that mere rumors of a bank's failure are not sufficient to put it on notice that a bank's assets are subject to criminal forfeiture. In general, this proposition may be true but it does not fairly characterize this case. BCCI was not an average bank, and its collapse was not a typical bank failure. As shown by these few excerpts, BCCI's fraud and corruption were widely reported. Contrary to American Express Bank's claim, BCCI's misdeeds were not limited to Florida where it pled guilty to money laundering in 1991. Unlike American Express Bank, some banks responded to the growing scandal by cutting their ties with BCCI. *See, e.g.,* Pasztor & Truell, "Noriega Had Secret Account at BCCI For Personal Use, Bank Official Testifies," Wall St. J. (Oct. 13, 1988) (citing BCCI spokesman who confirmed that some international banks had suspended or cut their lines of credit to BCCI). Given the highly publicized nature of BCCI's troubles, the petitioner's claim that a sophisticated banking entity could reasonably be without cause to believe that BCCI's assets were subject to *forfeiture rings hollow. See Matter of Liquidation of New York Agency and other Assets of Bank of Credit and Commerce Int'l, S.A.,* 223 A.D.2d 184, 186, 645 N.Y.S.2d 779, 780 (1 Dept.1996), *leave to appeal granted,* 89 N.Y.2d 802, 653 N.Y.S.2d 279, 675 N.E.2d 1232 (N.Y. Nov. 21, 1996); *see also* Truell & Bray, "Regulators World–Wide Close Down BCCI," Wall St. J. (July 8, 1991) ("But bankers who did business with BCCI knew per-

---

**15.** On this day, American Express Bank took the second of its three set offs.

**16.** On this day, American Express Bank took its last set off.

fectly well that they were taking a risk, noted Robin Munro–Davies, managing director of the London-based rating agency IBCA, Ltd., so they're likely to get little sympathy.").

*In Matter of Liquidation of BCCI*, the court stated that BCCI's "financial stability had been the subject of international headlines." 223 A.D.2d at 186, 645 N.Y.S.2d at 780. "[I]n the face of all the information at [the banks'] disposal concerning BCCI's difficulties," this New York state court held that CITIC Industrial Bank and the Industrial Bank of Japan bore the risk of their decision to continue doing business with a rogue bank. *See id.* at 194, 645 N.Y.S.2d at 785. American Express Bank's situation is not materially different.

The authority that American Express Bank cites does not hold to the contrary. The bank, relying upon *United States v. 92 Buena Vista Ave.*, 507 U.S. 111, 113 S.Ct. 1126, 122 L.Ed.2d 469 (1993), contends that this decision prevents the government from using the forfeiture provisions of RICO where innocent parties may be injured. *See* Notice to the Court at 5–71.[17] The government responds that *Buena Vista* does not affect criminal forfeiture proceedings under RICO, nor does it change the bottom line here.

In *Buena Vista*, faced with a challenge to the civil forfeiture provisions of 21 U.S.C. § 881(a)(6), the Supreme Court held that the "innocent owner" exception codified in that section of Title 21, U.S.Code, was available to persons other than those who were bona fide purchasers for value. Based upon the plain language of the text, the Court concluded that the innocent owner exception could include someone who acquired an interest in

real property through a gift. The Court also noted the limits on the relation back doctrine: while the government's right to the property may take effect upon commission of the act, and therefore relate back to that time, the government's title is not perfected until the order of forfeiture has been entered and third parties have had an opportunity to assert any defenses available to them in the forfeiture proceedings.

*Buena Vista* poses no difficulty with the result reached here. In *Buena Vista*, the Court merely clarified a statutory ambiguity that existed in the civil forfeiture provisions of the Comprehensive Drug Abuse Prevention and Control Act of 1970, § 511(a), 84 Stat. 1276, as amended, codified at 21 U.S.C. § 881(a)(6). *Buena Vista* is a case of statutory interpretation, and the criminal forfeiture provisions of RICO simply do not contain text similar to the innocent owner exception of 21 U.S.C. § 881(a)(6). *See Russello v. United States*, 464 U.S. 16, 25, 104 S.Ct. 296, 301–02, 78 L.Ed.2d 17 (1983) ("Language in one statute usually sheds little light upon the meaning of different language in another statute . . .")

Based upon *Buena Vista*, the United States properly withdrew the "lack of mutuality" argument raised in its motion to dismiss challenging the legal propriety of the set off. This Court has already concluded that the set off was valid under New York law; the question remaining is the consequence under RICO of taking a set off that results in a transfer of property. Determining that consequence requires only the application of the plain text of RICO's criminal forfeiture provisions, which lack the textual ambiguity of the civil forfeiture provision addressed in *Buena Vista*. As to the relation

---

**17.** The bank's simplistic statement of *Buena Vista's* holding is not accurate. Criminal forfeiture is not a tool for the government to injure the innocent, and it has not been used as such in this case. When persons and business entities do business with criminal enterprises, such as BCCI, it is an unfortunate fact of life that economic injury may result. The innocent persons and business entities, such as the thousands of BCCI depositors worldwide and banks (both domestic and foreign) who did business with BCCI, may be unable to recover their losses fully. Contrary to American Express Bank's contention, the government is not the source of any "innocent"

third party's problems-BCCI, whom the petitioner willingly engaged as a financial partner, is. Moreover, RICO expressly provides mechanisms for relief, if appropriate. The RICO third-party hearing process is one such mechanism, *see* 18 U.S.C. § 1963(g), and a petition for remission and mitigation submitted to the Attorney General is yet another. *See id* § 1963(g). In the context of the seizure of BCCI's assets, those third parties who do not meet the statutory criteria of 18 U.S.C. § 1963(*l*)(6) or who fail to persuade the Attorney General that remission or mitigation is appropriate under Section 1963(g) are free to petition the Worldwide Victims Fund.

back doctrine, *Buena Vista* demands precisely what American Express Bank has been provided: an opportunity to assert any defenses available under the statute prior to the perfection of the government's title.

**Constitutional challenge.**

American Express Bank also makes a series of constitutional arguments in the instant L–Claim: that its rights to due process were violated, because it was not afforded a pre-seizure hearing; that it has been exposed to multiple liability; that its property was taken without just compensation; that 18 U.S.C. § 1963 deprives it of its right to a jury trial; that it has been forced to bear the burden of proof and denied an opportunity to be heard in the underlying criminal action; and that its right to equal protection was violated because it was treated differently from similarly situated entities without a countervailing rational basis. *See* L–Claim ¶¶ 51–53; Opposition to the Motion to Dismiss at 43–44. The bank relies upon the Supreme Court's decision in *United States v. James Daniel Good Real Property*, 510 U.S. 43, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993). *See* Notice to the Court at 2. With the exception of their arguments regarding the decision in *James Daniel Good Real Property*, neither American Express Bank nor the government has expended much effort to make, or rebut, these arguments, and only a brief discussion is warranted here. For the reasons stated below, the bank's constitutional challenge to 18 U.S.C. § 1963(*l*) will be rejected.

■■■ Section 1963 has consistently survived constitutional challenges, *see, e.g., United States v. Sarbello*, 985 F.2d 716, 724 (3rd Cir.1993); *United States v. Reed*, 924 F.2d 1014, 1017 & 1018 (11th Cir.1991); *United States v. Tunnell*, 667 F.2d 1182, 1188 (5th Cir.1982); *United States v. Grande*, 620 F.2d 1026, 1037–39 (4th Cir.), *cert. denied sub norm. Castagna v. United States*, 449 U.S. 830, 101 S.Ct. 98, 66 L.Ed.2d 35 (1980); *United States v. Amato*, 367 F.Supp. 547, 548–49 (S.D.N.Y.1973), and American Express Bank has presented no persuasive rea-

sons for this Court to hold otherwise here. The Supreme Court has reviewed the statutory provisions of RICO on numerous occasions, *recognizing* the statute's broad sweep but never questioning its facial constitutionality. *See Russello*, 464 U.S. at 26–29, 104 S.Ct. at 302–04; *United States v. Turkette*, 452 U.S. 576, 585, 588–593, 101 S.Ct. 2524, 2529–30, 2531–34, 69 L.Ed.2d 246 (1981); *see also Caplin & Drysdale v. United States*, 491 U.S. 617, 628, 629–30, 109 S.Ct. 2646, 2654–55, 105 L.Ed.2d 528 (1989). Congress established the criminal forfeiture provisions in RICO to provide the government with a powerful, but rational, weapon to assault organized crime and its economic roots. *See Russello*, 464 U.S. at 26–29, 104 S.Ct. at 302–04; *see also Caplin & Drysdale*, 491 U.S. at 630, 109 S.Ct. at 2654–55. In doing so, Congress recognized the potential impact upon the third parties.[18] However, the mere fact that a third party, like American Express Bank, cannot satisfy the criteria that Congress established to determine whether a court must amend an order of forfeiture does not mean that the statute offends the constitutional provisions guaranteeing due process or equal protection. Section 1963(*l*) establishes a rational procedure that protects a third party's "opportunity to be heard in a meaningful time and meaningful manner," *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976), and American Express Bank has not demonstrated to the contrary.

Nor does *James Daniel Good Real Property* offer American Express Bank a safe harbor. That case involved the seizure of real property pursuant to a warrant that was issued by a magistrate without prior notice to the property owner or without providing the owner with an opportunity to be heard. In holding that the property owner's due process rights had been violated in that civil forfeiture action under 21 U.S.C. § 881(a)(7), the Supreme Court expressly limited its opinion to the seizure of real property. 510 U.S. at 61, 114 S.Ct. at 504–05. The Court stated that, absent exceptional circum-

---

**18.** In fact, the L–Claim procedures of 18 U.S.C. § 1963(*l*) were added to RICO in order to alleviate the constitutional due process concerns raised by criminal forfeitures where third parties

may have an interest in the forfeited property. *In re Petition of Chawla*, 46 F.3d at 1190; *United States v. Kramer*, 912 F.2d 1257, 1260 (11th Cir.1990).

stances, the seizure of real property does not justify the postponement of notice and a hearing. *Id.* However, the decision left undisturbed the Court's earlier decisions that held that pre-seizure notice is not required under the Due Process Clause where the seizure involves movable property. *Id.* at 51–52, 114 S.Ct. at 499–500 (distinguishing *Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974)). The Court expressly stated that it did "not address what sort of procedures are required for preforfeiture seizures of real property in the context of criminal forfeiture." *Id.* at 62 n. 3, 114 S.Ct. at 505 n. 3. (citing 21 U.S.C. § 853 and 18 U.S.C. § 1963).

In contrast to the facts of the civil forfeiture in *James Daniel Good Real Property,* this case involved a post-forfeiture seizure in a criminal case. Unlike the lack of pre-seizure notice in *James Daniel Good Real Property,* American Express Bank knew of the government's intention to forfeit the set off amount before the assets were actually turned over to the government. Moreover, although the statute provides no such right, American Express Bank requested and received an opportunity to be heard at a hearing before the seizure was effected. At that hearing, this Court considered the bank's arguments for a stay of the order directing seizure of the finds. American Express Bank's arguments were expressly rejected then, just as they are now. And, since that hearing, American Express Bank's claim has been adjudicated pursuant to the process established by Congress. *See In re Petition of Chawla,* 46 F.3d at 1190; *see, e.g., County of Oakland by Kuhn v. Vista Disposal, Inc.,* 826 F.Supp. 218, 222 (E.D.Mich.1993).

For these reasons, American Express Bank's constitutional challenges are rejected. The bank has failed to explain how it has been denied equal protection, and the Court's independent review indicates only that the petitioner has failed to satisfy the statutory criteria in a legislative regime that is rationale and has been correctly applied. With respect to due process, the challenge is equally flawed: American Express Bank has been provided all of the process to which it is constitutionally entitled.

**The "dissipated" assets claim.**

Finally, American Express Bank has raised a final shield, claiming that it dissipated the set off amount before January 31, 1992, and it is, therefore, excused from turning over substitute assets under the authority of *In re Moffitt, Zwerling & Kemler, P.C.,* 846 F.Supp. 463 (E.D.Va.1994), *aff'd sub norm. United States v. Moffitt, Zwerling & Kemler, P.C.,* 83 F.3d 660 (4th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 788, 136 L.Ed.2d 730 (1997); *In re Moffitt, Zwerling & Kemler, P.C.,* 875 F.Supp. 1152 (E.D.Va. 1995), *aff'd in part and rev'd in part sub nom. United States v. Moffitt, Zwerling & Kemler, P.C.,* 83 F.3d 660 (4th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 788, 136 L.Ed.2d 730 (1997); and *In re Moffitt, Zwerling & Kemler, P.C.,* 875 F.Supp. 1190 (E.D.Va.1995), *aff'd in part and rev'd in part sub nom. United States v. Moffitt, Zwerling & Kemler, P.C.,* 83 F.3d 660 (4th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 788, 136 L.Ed.2d 730 (1997).

*Moffitt* involved the criminal prosecution of a drug dealer who transferred $103,000 in drug proceeds to his attorneys in payment of his legal fees. At the time of the drug dealer's conviction, the court ordered the forfeiture of the $103,000 under the provisions of 21 U.S.C. § 853(a). Because transfers of forfeitable property by defendants to third parties are voidable under Section 853(c), the $103,000 was subject to forfeiture unless the law firm established that it was a bona fide purchaser of the funds and that it was reasonably without cause to know that the property was subject to forfeiture under 21 U.S.C. §§ 853(c), (n)(6)(B), which mirror the RICO provisions at issue in this case. The district court rejected the firm's third-party petition, holding that it was not a bona fide purchaser under Section 853(n)(6)(B). *See Moffitt I,* 846 F.Supp. at 472.

After the court rejected the law firm's petition, the firm advised the court that it had spent or otherwise dissipated all but a small fraction of the $103,000. The government then sought a sum equal to the $103,-000 to satisfy the order of forfeiture. The

court rejected the government's argument, holding that the substitute assets provision of Section 853(p) does not apply to third party transferees. *See Moffitt II,* 864 F.Supp. at 541. The district court explained that while Congress had failed to provide the government with a remedy where a third party dissipated forfeitable assets received from a criminal defendant before the government took action to forfeit or restrain the property, the third party remained liable to forfeit any property in its possession at the time the forfeiture order was entered that was derived from or traceable to the defendant. *Id.* at 543–44. Later, in separate rulings, the court reaffirmed that the law firm must forfeit traceable property and provide discovery as to how the funds had been dissipated, *Moffitt III,* 875 F.Supp. at 1163, and it held that the government's common law claims were preempted by federal forfeiture law. *Moffitt IV,* 875 F.Supp. at 1204.

The petitioner's reliance on *Moffitt* for the proposition that the dissipation of tainted assets can be used as a valid defense was effectively undermined by the Fourth Circuit on appeal. *United States v. Moffitt, Zwerling & Kemler, P.C.,* 83 F.3d 660, 669 (4th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 788, 136 L.Ed.2d 730 (1997). While acknowledging that only defendants themselves are subject to the substitute assets provision of 21 U.S.C. § 853(p), the Court of Appeals rejected the law firm's argument that it could spend assets that were subject to forfeiture and then use the substitute assets provision as a shield from the broad forfeiture tools available to the government. 83 F.3d at 669.

■ The district court's opinions in *Moffitt* do not, despite the petitioner's suggestion otherwise, allow third parties to avoid RICO forfeiture by promptly dissipating transferred assets which constitute the ill-gotten gains of criminal defendants. Not only is the reasoning of this portion of the *Moffitt* opinions less than compelling, but such reasoning is inapplicable here, given the substantially different facts underlying American Express Bank's petition. Both parties agree that when BCCI opened its account and deposited

$150,000,000, American Express Bank acquired title to the funds and BCCI became a general creditor to the petitioner in the amount on deposit. Unlike in *Moffitt,* where the criminal defendant transferred $103,000 as payment for legal services which was deposited in a specific account, specific funds are not at issue. The property interest transferred to American Express Bank is the credit taken by that bank to reduce its liabilities. The set off taken by the bank did not involve acquisition of an identifiable *res.* The set off reduced the bank's liabilities and increased its net worth. Taking a set off is not the same as acquiring funds, placing those funds into a specific account and then dissipating them, as occurred in *Moffitt.*

■ When tainted and untainted funds are commingled in a specific account, accounting principles have been applied to trace the funds. *See, e.g., United States v. Moore,* 27 F.3d 969, 976–77 (4th Cir.), *cert. denied,* 513 U.S. 979, 115 S.Ct. 459, 130 L.Ed.2d 367 (1994); *United States v. Laykin,* 886 F.2d 1534, 1541 (9th Cir.1989), *cert. denied,* 496 U.S. 905, 110 S.Ct. 2586, 110 L.Ed.2d 267 (1990); *United States v. Banco Cafetero Panama,* 797 F.2d 1154, 1161 (2d Cir.1986); *see also Moffitt,* 83 F.3d at 670–71. However, it is not at all clear that the credit resulting from American Express Bank's set off fits this mold, thus requiring the application of a "lower intermediate balance" test. Nor is it entirely clear that the tracing rules outlined in *Banco Cafetero* even apply, since that case involved a civil forfeiture prior to the enactment of 18 U.S.C. § 984. *See United States v. All Funds Presently on Deposit or Attempted to be Deposited in any Accounts Maintained at American Express Bank, et al.,* 832 F.Supp. 542, 551–58 (E.D.N.Y.1993). Nevertheless, accepting *arguendo* that tracing rules do apply and assuming that the set off credit was commingled with the bank's general assets, the government may retain the set off (i.e., the amount of the credit) unless American Express Bank's net worth fell below the value of the credit prior to entry of the Order of

Forfeiture. *See Banco Cafetero,* 797 F.2d at 1161.[19]

The government's motion will be granted.

## CONCLUSION

For the reasons stated above, it is hereby

**ORDERED** that the government's Motion for Summary Judgment is granted. The Petition of American Express Bank, Ltd., Pursuant to 18 U.S.C. § 1963 is dismissed with prejudice. Judgment will be entered by separate order issued this date.

IT IS SO ORDERED.

19. Under Banco *Cafetero,* the Second Circuit appears to have adopted the view that the government is entitled to forfeit either the credit balance or the actual funds that were initially deposited, but not both. 797 F.2d at 1161.