UNITED STATES of America,

v.

BCCI HOLDINGS (Luxembourg), S.A., Bank of Credit and Commerce International, S.A., Bank of Credit and Commerce International (Overseas) Limited, and International Credit and Investment Company (Overseas) Limited, Defendants.

Crim. Action No. 91–0655 (JHG.)

United States District Court, District of Columbia.

Aug. 26, 1997.

U.S. Dept. of Justice, Asset Forfeiture Office, Stefan D. Cassella, J. Christopher Kohn, Paul M. Herrup, Lloyd H. Randolph, Sharron Murphy, Washington, DC, for the Government.

James D. Skeen, Wright, Constable & Skeen, Baltimore, MD, for Claimants.

## *In re* First and Second Round Petitions of the People's Republic of Bangladesh and Bangladesh Bank

### *MEMORANDUM OPINION AND ORDER*

JOYCE HENS GREEN, District Judge.

Presently before the Court are the parties' cross motions for summary judgment regarding the First and Second Round Petitions of the People's Republic of Bangladesh and Bangladesh Bank (hereinafter referred to respectively as "First Round L–Claim" and "Second Round L–Claim" or collectively as "L–Claims"), which were filed pursuant to 18 U.S.C. § 1963(*l*) (1994). This Court previously held that the Government of Bangladesh had standing to assert a third-party claim under the criminal forfeiture provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Pub.L. No. 91–452, 84 Stat. 941 (1970), as amended, codified at 18 U.S.C. § 1961 *et seq. See United States v. BCCI Holdings, Inc. (In re* Petition of BCCI(O) Foreign Branches, *et al.*), 833 F.Supp. 32, 36 (D.D.C.1993), *aff'd,* 46 F.3d 1185 (D.C.Cir.1995), *cert. denied sub nom. Chawla v. United States,* 515 U.S. 1160, 115 S.Ct. 2613, 132 L.Ed.2d 856.

Upon consideration of the parties' motions, memoranda and exhibits, their briefs in opposition and replies, as well as the entire record in this matter, it is clear that there is no genuine dispute regarding any material fact and that the United States is entitled to

judgment as a matter of law. Accordingly, the United States' motion for summary judgment will be granted, the petitioner's motion for summary judgment will be denied, and the L–Claims will be dismissed.

## Background

The facts surrounding BCCI's collapse are well known in the financial and legal communities, but certain facts bear repeating to set the stage for resolving the instant motions for summary judgment and Bangladesh's L–Claims.[1] In early 1991, the Bank of England received troubling information about BCCI's financial condition and integrity. In response, it commissioned a special audit, which "disclosed evidence of a complex and massive fraud at BCCI, including substantial loan and treasury account losses, misappropriation of funds, unrecorded deposits, the creation and manipulation of fictitious accounts to conceal bank losses, and concealment from regulatory authorities of BCCI's mismanagement and true financial position." Corrigan, Mattingly & Taylor, *The Federal Reserve's Views on BCCI,* 26 Int'l Law. 963, 970–71 (1992) (based on testimony before the Committee on Banking, Finance and Urban Affairs of the United States House of Representatives on September 3, 1991).

The results of the audit were shared with regulators in other countries, and, on July 5, 1991, banking regulators in the United Kingdom, Luxembourg and the United States, froze assets owned or controlled by BCCI. In New York, the Superintendent of Banks seized BCCI's assets at various New York banks, including those at American Express Bank, Ltd., and the Bank of California. By July 6th, eighteen countries had shut down BCCI's operations in their jurisdictions, and, as of July 29, 1991, forty-four countries had closed down BCCI branches.

On November 15, 1991, a three-count Indictment, which included charges of conspiracy, wire fraud and racketeering against BCCI, was filed in this Court. On January 24, 1992, this Court, following findings of fact and conclusions of law with supporting reasons made in open court, accepted the pleas of guilty of the four corporate defendants, collectively known as BCCI, and the Plea Agreement between them and the United States of America. *See* Transcript of Guilty Plea Proceedings at 7 (Jan. 24, 1992). In accordance with 18 U.S.C. § 1963, this Court then entered an Order of Forfeiture.

Under paragraph 9 of the Plea Agreement, BCCI forfeited all of its property interests in the United States. Pursuant to paragraph 1(e) of the Forfeiture Order, the corporate defendants forfeited to the United States their ownership interests in all property located in the United States, including, without limitation, real property and all tangible and intangible personal property, however held, whether subsequently identified, determined or discovered in the course of the ongoing liquidation proceedings described therein or otherwise identified, determined, or discovered in any manner at any time (excluding property brought into the United States by or on behalf of the Court–Appointed Fiduciaries of BCCI in the course of the management or disbursement of the liquidation estates). Attached to the Order of Forfeiture, as amended, was a list of BCCI accounts, with corresponding numbers, names, and approximate balances, which the United States Marshals Service was directed to seize forthwith.

At the time the Court entered the Order of Forfeiture, it was understood that the United States had been unable to identify all of BCCI's assets in the United States. Accordingly, the United States later petitioned the Court to amend the Order of Forfeiture to identify subsequently identified assets. The Court granted the United States' first request to amend the Order of Forfeiture and issued the First Supplemental Order on January 31, 1992. This Order directed the immediate seizure of the specific assets listed therein. Included among the assets seized were two accounts in the name of BCCI (Overseas) Ltd. ("BCCI(O)"), Dhaka and Chittagong branches, at the New York office

---

1. "BCCI," as used herein, refers collectively to BCCI Holdings (Luxembourg) S.A., its two operating subsidiaries, Bank of Credit and Commerce International, S.A., and Bank of Credit and Commerce International (Overseas) Limited, and International Credit and Investment Company (Overseas) Limited, an entity previously found to be the alter ego of the other BCCI entities.

of American Express Bank, which accounts were numbered 53066 and 53165, with respective balances of US$610,940.61 and US$4,305,427.70. A Second Supplemental Order of Forfeiture was issued on July 29, 1992, directing the seizure of assets including two accounts at the Bank of California in the name of BCCI(O) and its Bangladesh branches, numbered 91–212373–1121 and 91–209411–1121, with respective balances of US$398,724.15 and US$3,155,691.38.

The Plea Agreement also established the Worldwide Victims Fund and the U.S. Fund. Under the terms of the Plea Agreement, forfeited assets were to be disbursed in equal amounts to the Worldwide Victims Fund and the U.S. Fund. *See* Plea Agreement ¶ 11(c). The broad purpose of the Worldwide Victims Fund, operated by the Court–Appointed Fiduciaries, is to distribute funds "only to innocent depositors, creditors and other victims of BCCI whose claims are not derived directly or indirectly through violations of United States or other laws concerning narcotics, terrorism, money laundering, crimes of violence, or other acts generally recognized as felonies or similar crimes under the law of countries subscribing to recognized norms of international justice." *Id.* ¶ 14.

The purpose of the U.S. Fund is more specific, but no less compensatory. In addition to allowing for reimbursement of the costs of investigation and prosecution of BCCI, bank insurance and other matters, the U.S. Fund is also available to provide "restitution to victims of BCCI, which may include remission to the Court Appointed Fiduciaries in accordance with 18 U.S.C. § 1963(g) for the purpose of facilitating an increase in assets available for distribution by the Court–Appointed Fiduciaries to innocent worldwide victims of BCCI, and which may include claims related to the failure of Cen-Trust, if any." *Id.* ¶ 12(f). As a result of BCCI's guilty plea and the subsequent criminal forfeiture proceedings, the United States has "recovered nearly $800 million, virtually all of which has been, or will be, distributed to the victims of the fraud." Testimony of Stefan Cassella before the Judiciary Committee of the House of Representatives (July 22, 1996), 1996 WL 410099, *5 (F.D.C.H.).[2]

The following facts are relevant to the instant L–Claims and are either not in dispute or not reasonably disputed. BCCI(O)'s Chittagong and Dhaka branches opened and maintained the accounts at issue with American Express Bank and the Bank of California.[3] On July 5, 1991, pursuant to orders by New York State banking regulators and the Federal Reserve, all BCCI accounts, including those of the Chittagong and Dhaka branches of BCCI(O) at American Express Bank and Bank of California, were frozen. The dollars in those accounts ("forfeited accounts") were subsequently seized pursuant to this Court's Orders of Forfeiture.

By way of background, Defendant BCCI(O) was incorporated in the Cayman Islands and was registered (licensed) as a banking company in Bangladesh. BCCI(O), which had a single board of directors, operated three main branches in Bangladesh—at Dhaka, Chittagong and Khulna. These branches neither had separate boards of directors nor were they incorporated separately from BCCI(O). Each branch was, however, licensed separately in Bangladesh and authorized to operate as a dealer of foreign exchange.[4] Each of the branches was classi-

2. In 1995, over $225 million was disbursed to the Court Appointed Fiduciaries for the Worldwide Victims Fund. *See* Notice to the Court at 1 (filed Aug. 13, 1996). On August 1, 1996, the United States disbursed an additional $83,651,-863.24, *id.* at 2, and, on May 22, 1997, Attorney General Janet Reno "determined that the United States would transfer 100 percent of its share of the forfeited funds to the Worldwide Victims Fund so that the funds might be distributed to all BCCI victims equally on a pro rata basis." Notice to the Court at 2 (filed July 11, 1997).

3. While not material to resolving the instant cross-motions, the Chittagong and Dhaka branch accounts at American Express Bank were opened on November 23, 1977, and March 12, 1979, respectively, the Chittagong and Dhaka branches opened their accounts at the Bank of California on May 23, 1991, and December 13, 1990, respectively.

4. Foreign currency is defined under Bangladesh law as "any currency other than Bangladesh currency." Foreign Exchange Regulation Act, 1947, Act No. VII of 1947 (March 11, 1947), as amended, ("FERA") § 2(c), attached to United States Motion for Summary Judgment at Ex. C. Foreign exchange is defined as "foreign currency and includes ... all deposits, credits and bal-

fied by BCCI(O) as a branch of the parent bank and not as an independent affiliate or subsidiary.

BCCI(O) granted each of the Bangladesh branches only limited authority to make decisions. If a proposal was beyond a Bangladesh branch's authority, the proposal would be forwarded to the country committee for BCCI(O) in Bangladesh. If the proposal exceeded the authority of the country committee, it would be sent to BCCI(O)'s regional committee in Hong Kong. If the proposal exceeded the authority of the regional committee, it would be sent to BCCI(O)'s Central Bank Committee in London. And, if the proposal exceeded the Central Bank Committee's authority, it would be sent to the BCCI(O) Board of Directors.

Bangladesh Bank (the "Bank") is an instrumentality of the Government of Bangladesh. As such, the Bank regulates foreign exchange within Bangladesh by setting the rate of exchange for foreign currency and by imposing a ceiling on the amount of foreign exchange that a bank in Bangladesh may hold at any given time. This foreign exchange ceiling, which is a monetary amount calculated in either Taka (the currency of Bangladesh) or in dollars and based on the volume of transactions involving foreign exchange, is established by the Bank and communicated to authorized dealers in Bangladesh through circulars and notifications. Once a bank in Bangladesh reaches its foreign exchange ceiling, the authorized dealer is required to transfer the amount in excess of the ceiling to Bangladesh Bank. Authorized dealers who fail to transfer excess foreign currency are subject to penalties under Bangladesh law. The BCCI(O) branches, like other authorized dealers in Bangladesh, were required to submit monthly reports to Bangladesh Bank on their foreign exchange operations.

Pursuant to the Foreign Exchange Control Manual ("FECM"), foreign currencies held by authorized dealers are held "at the disposal of Bangladesh Bank." FECM, Chapter IV, p. 9, ¶ 2. The FECM states that the Bank

"may give instructions with regard to the disposal of such currencies" and that it "may direct authorized dealers at any time to sell ... foreign currency held by them to the Bangladesh Bank or to such other person or persons as the Bangladesh Bank may direct." *Id.* The undisputed evidence of record indicates that whenever Bangladesh Bank takes foreign exchange from an authorized dealer, it has paid the dealer the equivalent value in Taka.

Pursuant to past practice as documented in the record, when Bangladesh branches of BCCI(O) transferred dollars to Bangladesh Bank, the BCCI(O) branch would telex American Express Bank or Bank of California, directing them to debit BCCI(O)'s accounts for the amounts to be transferred. American Express Bank or the Bank of California, as applicable, would then transfer the specified dollar amount through an account at Morgan Guaranty Bank to Bangladesh Bank's account at the Federal Reserve. Once Bangladesh Bank received the dollars in its Federal Reserve account, it would then credit BCCI(O)'s account at Bangladesh Bank with the equivalent value of Taka. Such payments were reflected as credits on the Bank's books for BCCI(O)'s accounts, but were not recorded until after the Bank received the foreign exchange.

In addition to transferring dollars to Bangladesh Bank, the BCCI(O) branches in Bangladesh would also buy foreign currency from the Bank. These branches would pay Taka when buying such foreign exchange, and the transfers would be reflected as debits in BCCI(O)'s Taka accounts at Bangladesh Bank.

The petitioner has not identified any evidence of record, pursuant to Local Rule 108(h), indicating that, prior to July 5, 1991, Bangladesh Bank gave any instructions to the BCCI(O) branches directing disposal of the specific U.S. dollars in the forfeited accounts. The parties agree, however, that Bangladesh Bank did not, in general or specifically here, instruct the BCCI(O) branches to sell foreign exchange to it, and there is no evidence that the BCCI(O) branches had ex-

---

ances payable in any foreign currency and any draft, traveller's cheque, letter of credit and bill of exchange expressed or drawn in Bangladesh currency but payable in any foreign currency." *Id.* § 2(d).

ceeded the foreign currency ceilings set by Bangladesh Bank.[5] After BCCI(O)'s accounts were frozen on July 5, 1991, there were, of course, no instructions for transfers that were honored, and therefore no transfers were made from those accounts to Bangladesh Bank.[6]

This Court previously denied the United States' motion to dismiss, determining that the law of Bangladesh would provide the rule of decision to determine whether the petitioner had a superior or vested legal right, title or interest in the forfeited property. *See In re Petition of BCCI(O) Foreign Branches*, 833 F.Supp. at 36. The parties were provided with the opportunity to conduct discovery, *see* Order of Sept. 27, 1993, at 4, and the Court extended discovery once upon a joint request by the parties. *See* Joint Motion at 4 (filed and approved on Oct. 29, 1993). While the Court offered an evidentiary hearing on the L–Claims, *see* Order of Sept. 27, 1993, at 2, the parties agreed to attempt resolution first by filing cross-motions for summary judgment. Those motions are now ripe.

### Discussion

BCCI's assets were forfeited pursuant to 18 U.S.C. § 1963,[7] which sets forth an order-ly procedure by which third parties seeking to recover interests in forfeited property may obtain judicial resolution of their claims. It permits any person, other than the defendant, claiming a legal interest in forfeited property to petition the Court for a hearing to adjudicate the validity of that interest. 18 U.S.C. § 1963(*l*)(2).[8] Section 1963(*l*)(6) sets forth the substantive elements that a third party must establish to obtain amendment of an order of forfeiture:

If, after the hearing, the court determines that the petitioner has established by a preponderance of the evidence that—

(A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or

(B) the petitioner is a bona fide purchaser for value of the right, title, or

(C) claim against; or
(D) property or contractual right of any kind affording a source of influence over;

any enterprise which the person has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962; and

(3) any property constituting, or derived from, any proceeds which the person has obtained directly or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962.

The court, in imposing sentence on such person shall order ... that the person forfeit to the United States all property described in this subsection.

---

**5.** In fact, the evidence of record reflects that the BCCI(O) bank official deposed, Mr. Rahman was uncertain or did not know the amount of foreign currency that it would take to be in excess of ceiling set by Bangladesh Bank that applied to the BCCI(O) branches. As explained later in this opinion, however, even had the BCCI(O) branches exceeded such ceiling and assuming (without deciding) that those branches were obligated (but failed to) to transfer the excess foreign currency to Bangladesh Bank, such failure would not automatically vest title or other cognizable interest or right in Bangladesh sufficient to amend the order of forfeiture pursuant to 18 U.S.C. § 1963.

**6.** While it is not clear whether any instructions were issued by Bangladesh Bank after July 5, 1991, such a fact is not material.

**7.** 18 U.SC § 1963(a) provides, in relevant part: Whoever violates any provision of section 1962 of this chapter shall ... forfeit to the United States, irrespective of any provision of State law—
(1) any interest the person has acquired or maintained in violation of section 1962; (2) any—
(A) interest in;
(B) security of;

**8.** This provision provides:

Any person other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States pursuant to this section may, within thirty days of the final publication of notice or his receipt of notice under paragraph (1), whichever is earlier, petition the court for a hearing to adjudicate the validity of his alleged interest in the property. The hearing shall be held before the court alone, without a jury.

interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section;

the court shall amend the order of forfeiture in accordance with its determination.

18 U.S.C. § 1963(*l*)(6).

A petitioner must first establish standing. Only by establishing standing and alleging the requisite elements of either § 1963(*l*)(6)(A) or § 1963(*l*)(6)(B) may a party obtain judicial relief from an order of forfeiture. *See In re Petition of BCCI(O) Foreign Branches*, 833 F.Supp. at 36; *United States v. BCCI Holdings (Luxembourg), S.A., et al. (In re Petition of Chawla)*, 833 F.Supp. 9, 13 (D.D.C.1993), *aff'd*, 46 F.3d 1185, 1188 (D.C.Cir.), *cert. denied sub nom. Chawla v. United States*, 515 U.S. 1160, 115 S.Ct. 2613, 132 L.Ed.2d 856 (1995); *see also United States v. Schwimmer*, 968 F.2d 1570, 1584 (2nd Cir.1992); *United States v. Lavin*, 942 F.2d 177, 187 (3rd Cir.1991). This Court has ruled that the petitioner has standing under Section 1963, *see* 833 F.Supp. at 40, and this matter is now ripe for resolution on the merits.

Summary judgment is appropriate when there is "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are any genuine issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The role of the Court on a motion for summary judgment is not to weigh the evidence, but to determine whether genuine issues of material fact exist for trial. *Abraham v. Graphic Arts Int'l Union*, 660 F.2d 811, 814 (D.C.Cir.1981). To survive summary judgment, the nonmoving party must offer more than mere allegations, *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11, by going "beyond the pleadings and by its own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If the material facts proffered by the nonmoving party are subject to diverse interpretations, summary judgment is not available. *Tao v. Freeh*, 27 F.3d 635, 638 (D.C.Cir.1994). Any doubts must be resolved in favor of the nonmoving party, *Abraham*, 660 F.2d at 815, and the nonmoving party is entitled to all justifiable inferences. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513–14. However, legal conclusions "cloaked" as facts are not sufficient to create a genuine issue of material fact. And, of course, the parties are obligated, pursuant to Local Rule 108(h), to identify the material facts and point to evidence of record that supports their respective positions. *Jackson v. Finnegan, Henderson, Farabow, Garrett*, 101 F.3d 145, 150–51 (D.C.Cir.1996).

■ Because the interpretation of foreign law is a question of law, not fact, *see* Fed.R.Civ.P. 44.1; Fed.R.Crim.P. 26.1, matters involving such interpretations may be resolved by summary judgment. *See Henry v. S/S Bermuda Star*, 863 F.2d 1225, 1229 n. 11 (5th Cir.1989); *Bassis v. Universal Line, S.A.*, 436 F.2d 64, 68 (2d Cir.1970); 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2d § 2444, at 643–49 (1995). Any difference of opinion that the parties or their experts may have regarding the interpretation of a provision of foreign law does not create a genuine issue of material fact. *Henry*, 863 F.2d at 1229 n. 11; *Bassis*, 436 F.2d at 68, 9 Wright & Miller, *supra* § 2444, at 652.

Since there is no genuine dispute as to any material fact in this matter, summary judgment is appropriate, Fed.R.Civ.P. 56; *see Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511, and the question is simply whether under 18 U.S.C. § 1963(*l*)(6) the United States is entitled to judgment as a matter of law.

**Subsection 1963(*1*)(6)(A)**

■ To prevail in its motion for judgment under 18 U.S.C. § 1963(*l*)(6)(A), the United States must demonstrate that under the undisputed facts, the petitioner cannot show that it has a legal right, title, or interest in

the property ordered forfeited, and which was vested or superior to BCCI's interest at the time BCCI committed the acts that gave rise to the forfeiture of the property. In support of their cross-motions for summary judgment, each party relies upon a Bangladesh statute, the Foreign Exchange Regulation Act ("FERA"), and a manual, the Foreign Exchange Control Manual ("FECM"), which implements the FERA. The petitioner contends that these authorities establish legal right, title or interest to the dollars in the forfeited accounts or, alternatively, create the functional equivalent of a security interest in the forfeited funds.[9] *See, e.g.*, Pet. Motion for Summary Judgment at 2 & 5–8; Opp. at 6–7; Pet. Reply at 5. On the other band, the United States argues that under Bangladesh law, title to the foreign exchange remained with BCCI(O) unless and until the BCCI(O) foreign branches sold such foreign exchange to Bangladesh—which they never did. According to the United States, at most, Bangladesh law creates an option to direct a bank to sell foreign exchange to Bangladesh Bank.[10] *See, e.g.*, United States' Motion for Summary Judgment at 19. However, where that option remains unexercised, as here, or where no sale otherwise takes place, title to foreign exchange is not transferred to Bangladesh Bank or the Government of Bangladesh. *Id.* Resolving this dispute turns upon an interpretation of Bangladesh law as reflected in the FERA and the FECM.

Bangladesh law is consistent with the general principle of banking law that when funds

---

9. The petitioner summarizes its argument as follows:

The sum and substance of Bangladesh's argument of entitlement to the proceeds of the forfeited accounts is this: that under Bangladesh law, all foreign exchange (i.e., dollars) generated by the commercial activities of entities authorized to do so are to be held at all times at the disposal of Bangladesh Bank, and the term "disposal" as used in Bangladesh law and regulation vests Bangladesh *Ab Initio* with superior right, title or interest in such foreign exchange regardless of the manner in which foreign exchange is subsequently utilized. Pet. Motion for Summary Judgment at 2.

\* \* \* \* \* \*

Here, the plain meaning of the cited provisions of the Exchange Control Manual—either under U.S. or Bengali law—creates a superior right, title or interest in Bangladesh Bank to all foreign currency generated by authorized dealers *Ab Initio*. That is to say, title to the dollars in the forfeited account at any time vested in Bangladesh Bank the moment those dollars were received by the BCCI(O) Bangladesh branches. *Id.* at 7.

\* \* \* \* \* \*

The Bank's claims to BCCI(O) Bangladesh branch foreign currency ... did not attach in the 80's or 90's when specific dollars were received and specific dollar accounts were opened by BCCI(O), but in 1976 when BCCI(O) agree to conduct its banking activities in Bangladesh in accordance with Bangladesh law and the dictates of Bangladesh banking rules and regulations, the crux of which was the obligation to hold "at all time" foreign currency at the "disposal" of the Bank. (Ex. 26). The Bank's superior right, title or interest in and to such foreign exchange therefore sprang into existence at the time of license and was neither account nor dollar amount specific. This is analogous to a person holding a security interest given by a

debtor on property acquired after the date of the agreement. Reply at 5.

10. The United States' position is generally as follows:

As outlined by [its experts on Bangladesh law] in their depositions, the Bangladesh branches' method of transferring dollars to Bangladesh Bank mirrors the United States' understanding and interpretation of Bangladesh law regarding legal right, title, or interest to foreign exchange. Bangladesh has no legal right, title, or interest in foreign exchange held by an authorized dealer *until* it has requested the dealer to sell some amount of foreign exchange to Bangladesh Bank, and the dealer has transferred that amount to Bangladesh Bank.

\* \* \* \* \* \*

... [The forfeited] dollars were never sold to Bangladesh Bank and, therefore, Bangladesh does not have legal right, title, or interest in them. Even if the Bangladesh branches of BCCI(O) should have sold the dollars in the Forfeited Accounts to Bangladesh Bank because the branches had exceeded their ceiling, no sale was ever transacted. And, as noted above, a dealer's failure to offer for sale foreign exchange held in excess of its ceiling does not result in a transfer of ownership rights to Bangladesh Bank.

Thus, under FERA, its corresponding regulations and Notifications, and the Manual, legal right, title, or interest in foreign exchange held by authorized dealers such as the Bangladesh branches of BCCI(O), does not rest in Bangladesh Bank until the dealer offers the foreign exchange for sale, Bangladesh Bank accepts the offer, and the dealer transfers the foreign exchange to Bangladesh Bank.

United States Motion for Summary Judgment at 19–20,

are deposited with a bank, title to those funds ordinarily transfers from the depositor to the bank. Hossain [11] Decl. ¶ 2, attached to United States Motion for Summary Judgment at Ex. G; Justice Subhan [12] Decl. ¶ 2, attached to United States' Motion for Summary Judgment at Ex. H; First Husain [13] Decl. ¶ 2, attached to United States' Motion for Summary Judgment at Ex. I; Islam [14] Decl. ¶ 2, attached to United States' Motion for Summary Judgment at Ex. K. The principal question here is whether applicable Bangladesh law, by statute, regulation or other authority, creates an exception to the general rule in the case of authorized dealers in foreign exchange.

Under FERA, authorized dealers of foreign exchange are subject to the regulatory authority of Bangladesh Bank. FERA § 3(3).[15] FERA establishes a number of restrictions on dealing in foreign exchange, including generally limiting the sale or purchase of foreign exchange to authorized dealers. *See, e.g., id.* § 4(1) ("no person other than an authorized dealer shall in Bangladesh ... buy or borrow from, or sell or lend to, or exchange with, any person not being an authorized dealer, any foreign exchange"); *id.* § 4(3) ("Where any foreign exchange is acquired by any person other than an authorized dealer for any particular purpose, ... the said person shall not use the foreign exchange so acquired otherwise than for that purpose...."). Section 9 of FERA, which is entitled "Acquisition by Government of Foreign Exchange," provides for the sale of foreign exchange to the Bangladesh Bank. In relevant part, this provision states: [16]

> The Government may, by notification in the official Gazette, order every person in, or resident in Bangladesh—
>
> (a) who owns such foreign exchange as may be specified in the notification, to offer it, or cause it to be offered for sale to the Bangladesh Bank on behalf of the Government or to such person, as the Bangladesh Bank may authorise for the purpose at such price as the Government may fix, being a price which is in the opinion of the Government not less than the market rate of the foreign exchange when it is offered for sale ...

One of the petitioner's legal experts, Dr. Rahman, construes Section 9 of the FERA broadly to empower the Government "to acquire foreign exchange from any one (sic) who holds such foreign exchange and to offer the same for sale to Bangladesh Bank or its

---

11. Dr. Kamal Hossain is a Senior Advocate of the Supreme Court of Bangladesh and a Barrister–at–Law. He has held a variety of positions in the Bangladesh government, including Foreign Minister, Minister of Law, Chairman of the Constitution Drafting Committee, and member of Parliament. *See* Hossain Decl. ¶ 1.

12. Mr. Justice K.M. Subhan served as a justice on the Supreme Court of Bangladesh until 1992. In addition to his judicial duties, Justice Subhan has also served as a law professor, teaching international law, commercial law and constitutional law. *See* Justice Subhan Decl. ¶ 1.

13. Mr. Altaf Husain is a Senior Advocate of the Supreme Court of Bangladesh. He is a commerce and law graduate from Dhaka University and is a Barrister–at–Law, having been called to the Bar by Lincoln's Inn, London. He practices law in Dhaka, Bangladesh. *See* First Husain Decl. ¶ 1; Second Husain Decl. ¶ 1., attached to United States' Motion for Summary Judgment at Ex. J.

14. Mr. Amir–Ul Islam is a Senior Advocate at the Supreme Court of Bangladesh. In addition to

his legal work in both Pakistan and Bangladesh, he has served as a law officer for the United Nations Secretariat. *See* Islam Decl. ¶ 1.

15. This provision provides, in whole:

> An authorized dealer shall in all his dealings, in foreign exchange comply with such general or special directions or instructions as the Bangladesh Bank may from time to time think fit to give, and, except with the previous permission of the Bangladesh Bank, an authorized dealer shall not engage in any transaction involving foreign exchange which is not in conformity with the terms of his authorization under this section. ·

16. The provision is inapplicable "to any foreign exchange acquired by a person *from* an authorized dealer and retained by him with the permission of the Bangladesh Bank for any purpose." FERA § 9 (emphasis added). While Section 9 also allows the Government to exempt any person or class of persons from the operation of an order issued under this Section, it does not facially exempt authorized dealers from the scope of its application.

agent authorized dealers." Rahman [17] Decl. ¶ 13, attached to Pet. Opp. As explained below, however, the principal issue is not whether Bangladesh Bank had the statutory authority to act, but whether it did so or, the absence of exercising its authority, whether it otherwise acquired legal right, title or interest to the forfeited accounts.

While the petitioner's other legal expert, Messr. Choudhury, is of the view that the FERA applies only to individuals (i.e, persons) and not to authorized dealers, his position is both unsupported by citation to legal authority and plainly inconsistent with other provisions of the Act itself *Compare* Choudhury [18] Decl. ¶ 4 with FERA §§ 1(2) (Act "applies to all citizens of Bangladesh and persons in the service of the Republic"); 2(a) (" 'authorized dealer' means a person"); 3(1) ("Bangladesh Bank may … authorize any person to deal in foreign exchange"); 4(1) ("no person other than an authorized dealer"); 4(2) ("no person whether an authorized dealer or otherwise"); *see also* Third Husain Decl. ¶ 4, attached to United States' Reply at Ex. I. The inclusion of "authorized dealer" within the meaning of the term "person" is also made clear by Section 9, which allows the Bangladesh Bank to exempt "any person or class of persons from operation" of an order issued pursuant to that section. *See, e.g.,* Notification No. 1(8)-EF/58 (Aug. 20, 1958), attached to the United States' Motion for Summary Judgment at Ex. L (ordering that "persons" who own foreign exchange offer such foreign exchange for sale, but expressly excluding application of the Notification Order to authorized dealers).[19] Contrary to the rules of construction recognized in Bangladesh, *see* Choudhury Decl. ¶ 4, Messr. Choudhury's opinion invites inconsistent interpretations of the same statute.

The FECM sets forth additional rules and regulations governing authorized dealers. Although the parties contest whether the FECM provides the exclusive authority applicable to authorized dealers like the BCCI(O) branches, both sides agree that the FECM contains specific and binding instructions issued by the Bangladesh Bank for such authorized dealers. Chapter IV, entitled "Foreign Currency Accounts of Authorized Dealers and Purchase and Sale of Foreign Currency," plainly provides for the sale of foreign exchange to Bangladesh Bank, at the option of the Bank:

> The foreign currency held by Authorized Dealers shall at all time be held at the disposal of the Bangladesh Bank. The Bangladesh Bank through its Exchange Control Department *may* give such instructions with regard to the disposal of such currencies as it may deem necessary and expedient. The Bangladesh Bank *may direct Authorized Dealers at any time to sell* either for ready delivery or for forward delivery, foreign currency held by them *to the Bangladesh Bank* or to such other person or persons as the Bangladesh Bank may direct.

FECM, Ch. IV, at 9, ¶ 2 (emphasis added).

Consistent with this provision, paragraph 3(b) of Chapter IV states that "[i]f it is observed that any Authorized Dealer is maintaining a balance in excess of the prescribed limit for which he cannot furnish a satisfactory explanation, he may be asked to sell the foreign currency." Similarly, "Authorized Dealers may freely buy from and sell to the Bangladesh Bank such foreign currencies as may be notified from time to time." *Id.* ¶ 8.

Like United States jurisprudence, Bangladesh applies a "plain meaning" presumption in interpreting statutory language and, as in the United States, "[i]t is a principle of statutory construction in Bangladesh that statu[t]es and regulations are to be read … consisten[tl]y." Choudhury Decl. ¶ 4. Un-

---

17. Dr. Rahman is a Senior Advocate of the Supreme Court of Bangladesh and a Barrister of Law (Grays Inn). He was President of the Supreme Court Bar Association, 1980–81 and 1991–92, a former Justice of the Supreme Court of Bangladesh and a Lecturer of Law at Dhaka University, Bangladesh. *See* Rahman Decl. ¶ 1

18. Messr. Choudhury is an attorney at law in Bangladesh and a member of the Bar of the Supreme Court of Bangladesh. *See* Choudhury Decl. ¶ 1.

19. This exclusion makes clear that the Bangladesh branches of BCCI(O) were exempt from the requirement to offer for sale automatically to Bangladesh Bank all foreign exchange received.

der the United States' interpretation, FERA and the FECM are fully consistent: the plain language of both the statute and the regulation make clear that Bangladesh enjoys an option (i.e., "it may") to require an authorized dealer "at any time to sell ... foreign currency to the Bangladesh Bank." The petitioner's argument is, however, at odds with the rules of statutory interpretation upon which it relies, because its interpretation places the statute in conflict with the regulation in the manual. Moreover, the petitioner's argument makes various provisions of the FERA internally inconsistent.

Significantly, neither the plain language of the FERA nor the FECM state that "[f]oreign exchange received by an authorized dealer outside Bangladesh ... automatically become[s] the property of Bangladesh or Bangladesh Bank." Hossain Decl. ¶ 4, attached to United States Motion for Summary Judgment at Ex. G. Based on the structure of the FERA and the plain text of both the FERA and the FECM, as supported by the evidence of the actual practice between BCCI(O) and Bangladesh Bank, see Raquib [20] Dep. TR at 35, attached to United States' Motion for Summary Judgment at Ex. B: Rahman [21] First Dep. TR at 213, attached to United States' Motion for Summary Judgment at Ex. A; Rahman Second Dep. TR at 60–61, attached to United States' Motion for Summary Judgment at Ex. E, it is clear that to acquire foreign exchange held by an authorized dealer, Bangladesh Bank must first direct the sale of such foreign exchange and pay authorized dealers for such foreign exchange before Bangladesh can be considered the owner. See Hossain Decl. ¶¶ 4–5; Justice Subhan Decl. ¶¶ 4–5; First Husain Decl. ¶¶ 3, 5; Islam Decl. ¶¶ 4–5; Third Husain Decl. ¶ 2. Similarly, Bangladesh Bank's mere ability to set a foreign exchange ceiling or the rate of foreign exchange, does not give it legal right, title, or interest in the foreign exchange held by an authorized dealer: Absent a sale, following the timely exercise of the Bank's option or which transfer is initiated by the authorized dealer, Bangladesh simply lacks a cognizable legal right, title or interest (let alone an interest that is either vested or superior to BCCI(O)'s). See First Husain Decl. ¶¶ 3 & 6–7; Hossain Decl. ¶ 4; Islam Decl. ¶ 5; Subhan Decl. ¶ 5; Third Husain Decl. ¶ 2.

At most, Bangladesh Bank possesses a right under Bangladesh law to purchase foreign exchange from authorized dealers at Bangladesh's pleasure. However, similar to the right of set-off in the United States, the option to acquire foreign exchange remains inchoate unless and until exercised and effectuated by Bangladesh Bank. *Compare United States v. BCCI Holdings, Inc. (In re Petition of American Express Bank, Ltd.)*, 961 F.Supp. 287, 292–93 (D.D.C.1997) (discretionary right to take set-off inchoate until exercised) *and United States v. BCCI Holdings, Inc. (In re Petition of American Express Bank, Ltd.)*, 941 F.Supp. 180, 186 (D.D.C.1996) (same) *with* Choudhury Decl. ¶ 9 ("Alternatively, that cited language can be construed to create an option in favour of the Bank to purchase any and all dollars held in a foreign currency maintained by an authorized dealer.").

Taking a contrary position and contending that it acquired title coincident with BCCI(O)'s acquisition of the foreign exchange, the petitioner primarily rests its argument on the following sentence: *"The foreign currencies held by Authorized Dealers shall at all time be held at the disposal of the Bangladesh Bank."* FECM, Ch. IV, at 9, ¶ 2, cited in Pet. Motion for Summary Judgment at 6 (emphasis in the petitioner's motion). As authority, Bangladesh relies principally upon Webster's Third International Dictionary and Black's Law Dictionary, which define "disposal" as including "the power or authority to dispose of or use at one's convenience" or, in general, the right to exercise control. *See also* Rahman Decl. ¶¶ 15–16 (relying upon American Heritage Dictionary

---

**20.** Mr. Abdur Raquib is the Executive Director of the Exchange Control Department of Bangladesh Bank.

**21.** Mr. A.I.M. Iftikar Rahman is the former Joint General Manager for BCCI(O) Bangladesh and, at the time of his deposition, was Deputy Managing Director of Eastern Bank Limited, which was established by the Government of Bangladesh and, pursuant to government order, assumed the assets and liabilities of BCCI(O) in Bangladesh.

to establish meaning of disposal).[22] The petitioner contends that the right to direct disposal of foreign exchange is tantamount to one of title *ab initio.* While citing to no authority, one of the petitioner's legal experts concludes:

> In the absence of any specific court rulings on the matter, Bangladesh law would [be] construe[d] to mean that, as of th[e time that BCCI(O) assumed its duty in 1976 to hold foreign currency at the disposal of the Bank] the Bank had a vested, superior right over that of the authorized dealer which attached to dollar holdings in specific dollar accounts.

Choudhury Decl. ¶ 7.

The petitioner's arguments are unpersuasive. While Bangladesh Bank may enjoy broad powers over its authorized dealers and their foreign exchange, the right to direct what an authorized dealer must do with such foreign exchange is not equivalent to the Bank acquiring legal title thereto. Unlike money deposited with a banker, like BCCI(O), which "becomes his property and is *absolutely at his disposal,*" Pet. Opp. at 6 (quoting Hossain Decl. ¶ 2, which quoted from Paget's *Law of Banking* ), the law of Bangladesh does not automatically transfer title to foreign exchange, carrying with it the same *absolute* disposal right incident to ownership. The plain text of the FECM merely requires that "foreign currencies . . . be held

at the disposal of Bangladesh Bank" and recognizes the Bank's right under FERA to direct the sale of foreign currency to the Bank.

█ Here, the petitioner has not cited any compelling authority for the proposition that the phrase "at the disposal" vests Bangladesh Bank with a superior right, title or a legal interest in foreign currency held by New York banks in the accounts of the BCCI(O) Bangladesh branches. Construing the phrase as the petitioner suggests would, in fact, do violence to other provisions of the FERA and the FECM which plainly allow the Bank, at its option, to direct the sale of foreign currency to the Bank itself or to another entity. Moreover, the petitioner's interpretation is at odds with the principles of statutory interpretation that are applied under Bangladesh law, as explained by the petitioner's own legal expert. *See* Choudhury Decl. ¶ 4.[23]

The undisputed facts make clear that no sale occurred with respect to the forfeited accounts, and this Court has determined that Bangladesh law does not automatically create a legal right, title, or interest in foreign exchange held in BCCI(O) accounts maintained in New York by BCCI(O) branches. Because the funds in the forfeited accounts were never sold to Bangladesh Bank, such

**22.** The petitioner states that "the operative term is 'disposal,' and its meaning in Bangladesh is the same as it is in the U.S." Pet. Opp. at 6. This, of course, makes the Court's task considerably easier and renders unnecessary the petitioner's suggestion to seek the Supreme Court of Bangladesh's interpretation of this term. *See* Pet. Reply at 13 (suggesting that the Court consider, in "an the exercise of this Court's discretion," such certification). Similarly, given that the rules for interpreting statutes are similar to those used in the United States, it is unnecessary for the Court to exercise her discretion to certify interpretive questions regarding provisions of FERA.

**23.** Alleging through Messr Choudhury's declaration that the United States' experts are actively involved in partisan politics within Bangladesh and have a direct pecuniary interest to BCCI, the petitioner has asked this Court to be aware of their potential bias and to take this into consideration "in weighing the value of [the expert testimony] provided by the U.S." Second Choudhury Decl. ¶ 6; Pet. Opp. at 6–7. As requested, the Court has considered the Choudhury allegations, but finds them neither persuasive nor material. The United States' experts take issue with the Choudhury allegations regarding their political, professional and economic associations, *see* United States Reply at Exs. 1–4, but the petitioner's mere request that the Court consider the legal expert's associations (and the experts' retort to the petitioner's allegations) are not sufficient to create a genuine issue of material fact. While summary judgment is not necessarily unavailable merely because credibility allegations are made regarding expert testimony, *see, e.g., Alevromagiros v. Hechinger Co.,* 993 F.2d 417, 421 (4th Cir.1993); *Anderson v. Coughlin,* 757 F.2d 33, 36 (2nd Cir.1985); *Blandford v. Masco Industries, Inc.,* 799 F.Supp. 666, 669 (N.D.Tex.1992), when a legal expert's testimony is based upon the application of rules, such as the "plain meaning rule," which are subject to objective review by (and quite familiar to) the Court, allegations of bias are insufficient to make the expert's credibility material such as would be sufficient to preclude a grant of summary judgment.

funds do not belong to Bangladesh. Moreover, this Court rejects, as she has in the past, the petitioner's bare suggestion that the Court should impose a constructive trust. *See In re Petition of BCCI(O) Foreign Branches,* 833 F.Supp. at 39. In sum, the petitioner has not demonstrated that the laws of Bangladesh create a legal right, title, or interest in the forfeited accounts sufficient for this Court to amend the relevant Orders of Forfeiture pursuant to 18 U.S.C. § 1963(*l*)(6)(A).

**Subsection 1963(*l*)(6)(B).**

The petitioner's attempt to seek the protection of Subsection (*l*)(6)(B) is equally unavailing. The plain language of the statute protects only bona fide *purchasers* for value. *United States v. BCCI Holdings (In re Petitions of Trade Creditors),* 833 F.Supp. 22, 28 (D.D.C.1993), *aff'd,* 48 F.3d 551 (D.C.Cir.), *cert. denied sub nom. Liquidation Comm'n for BCCI (Overseas) Ltd, Macau v. United States,* —— U.S. ——, 116 S.Ct. 563, 133 L.Ed.2d 489 (1995). Not only does Bangladesh lack a cognizable property right, even were the sale of foreign currency otherwise subject to the application of this subsection, *see In re Petition of American Express Bank,* 961 F.Supp. at 295, but there simply has been no *purchase* by Bangladesh or Bangladesh Bank. *See id.*

Accordingly, the government's motion will be granted; the petitioner's motion will be denied; and the L–Claims will be dismissed.[24]

## CONCLUSION

For the reasons stated above, it is hereby

**ORDERED** that the United State's motion for summary judgment is granted and the motion for summary judgment by Petitioner People's Republic of Bangladesh and Bangladesh Bank is denied. The L–Claims are

---

**24.** Because Bangladesh indicated in its discovery responses that it still contends that the Bangladesh branches in Dhaka and Chittagong were separate entities from BCCI(O) under its law, the United States has offered argument and identified evidence disputing Bangladesh's position. Despite Bangladesh's view, as this Court has held previously, federal common law, not foreign law, controls this question and the foreign branches

dismissed. Judgment will be entered separately in accordance with Fed.R.Civ.P. 58.

IT IS SO ORDERED.

of Defendant BCCI(O) lack standing since such foreign branches are not separate juridical entities. *In re Petition of BCCI(O) Foreign Branches,* 833 F.Supp. at 39. If it were now necessary to reach the question whether the BCCI(O) branches in Bangladesh were separate juridical entities, the Court would again rule in favor of the United States—as a matter of fact and law.